STATE OF NORTH CAROLINA v. KENNETH RANDALL HOLLINGSWORTH

No. 8426SC1109

(Filed 1 October 1985)

1. **Automobiles and Other Vehicles § 114; Homicide § 23.2— involuntary manslaughter arising from automobile accident—failure to instruct on contributory negligence of victims—no error**

     In a prosecution for involuntary manslaughter and driving under the influence arising from an automobile accident, the trial court did not err by failing to instruct the jury on the contributory negligence of the passengers in defendant's car in that they voluntarily accepted a ride with a visibly drunken driver. While the jury could find negligence on the part of the passengers, this negligence would be at most a concurring proximate cause of the passengers' deaths and would not insulate defendant from criminal liability.

2. **Automobiles and Other Vehicles § 114; Homicide § 23.2— involuntary manslaughter arising from automobile accident—failure to instruct on contributory negligence of victims—erroneous**

     In a prosecution for involuntary manslaughter and driving under the influence arising from an automobile accident, the jury should have been instructed to consider the possibility that the negligence of the driver of a car with which defendant collided was an insulating cause of the deaths of the two passengers in defendant's car where the driver testified that there was a two to three second time lapse from when he saw defendant's car to when he collided with it. Whether the driver was negligent in not applying the brakes or attempting to swerve around defendant's car, and whether that negligence constituted the sole proximate cause of the deaths of the passengers in defendant's car, are questions for the jury to decide.

3. **Automobiles and Other Vehicles § 126.2— DWI—blood sample drawn from unconscious defendant—test results admissible**

     A blood alcohol test performed on blood seized from an unconscious defendant who had not been arrested did not violate defendant's rights under the Fourth Amendment of the U. S. Constitution and Art. I, § 20 of the North Carolina Constitution because the extraction of blood may be characterized as a "slight intrusion," the body's breakdown of alcohol in the blood creates the reasonable risk that the evidence of intoxication will be quickly destroyed, and there was probable cause to arrest defendant at the time the blood sample was drawn in that defendant had been involved in an accident in circumstances indicating an impairment of coordination, the officer smelled the odor of alcohol from the crushed passenger side of defendant's car, the two passengers were not breathing and defendant was gasping for breath, beer cans on the floor were unopened and could not contribute to the odor, and there was no testimony concerning any dampness or puddles that would indicate spilled beer. G.S. 20-16.2.

APPEAL by defendant from *Lewis (Robert D.), Judge.* Judgment entered 15 June 1984 in MECKLENBURG County Superior Court. Heard in the Court of Appeals 20 August 1985.

Defendant was indicted on two counts of involuntary manslaughter and one count of driving under the influence.

The State's evidence tended to show the following facts and circumstances. At about midnight on the night of 31 July 1983, Kenneth R. Hollingsworth was driving a 1968 Chevrolet automobile in the outside northbound lane of South Boulevard, a four-lane street in Charlotte. There were two passengers in the front seat of the automobile: Michael Wayne McCarty and Brian Lee Keel. Samuel Cunningham, the driver of a 1979 Datsun, was in the inside lane. Hollingsworth pulled past the Datsun and attempted to change into the left lane. He did not leave enough room behind his automobile and the left rear bumper of his Chevrolet hooked onto the right front bumper of the Datsun. As Hollingsworth continued to move into the left lane, the Datsun was pushed up onto the median and the two cars separated. As Cunningham attempted to move back into a northbound lane, the Chevrolet passed in front of him, crossing over the median and becoming "airborne." The Chevrolet landed in a southbound lane, where a collision took place with a 1972 Buick driven by Jerry L. Pew.

Officer B. J. Tessnier arrived on the scene almost immediately afterward. Inside the Hollingsworth Chevrolet he noticed the two passengers, who were not breathing. Hollingsworth was unconscious but breathing heavily. Although Officer Tessnier did not actually smell defendant's breath, he did notice the odor of alcohol inside the vehicle. There were unopened cans of beer on the back seat floorboard.

The Emergency Medical Service declared the two passengers, Keel and McCarty, dead on the scene, applied first aid to Hollingsworth, and transported him to the Charlotte Memorial Hospital emergency room. At about 2:00 a.m., Officer Tessnier arrived at the hospital and asked Brenda Dasher, a nurse, for a blood alcohol sample. She drew two vials of blood from defendant's left hand. Defendant was unconscious during this full period. At no time that night did Officer Tessnier indicate that defendant was in custody or that he would be arrested when he

awakened. Analysis of this blood sample indicated a blood alcohol level of .19 milligram percent. Warrants for Hollingsworth's arrest on charges of involuntary manslaughter were issued 29 August 1983. True bills of indictment were sworn on 12 December 1983.

The defendant testified that he had consumed six or seven beers that day, beginning at one o'clock in the afternoon and ending around nine or ten o'clock that evening. He also testified that when the Chevrolet scraped the Datsun, McCarty, who was seated in the middle, next to defendant, jerked the wheel to the right, causing defendant, in his surprise, to jerk the wheel back the other way, sending the Chevrolet over the median. The car landed in the southbound lane and stalled. Defendant was attempting to restart the automobile when the collision occurred with the Buick driven by Jerry Pew. Defendant also testified that the street was well-lighted, enough so that he could not tell if his headlights had remained in operating condition after the car stalled.

Additional facts will be related as analysis requires.

The jury returned a verdict of guilty of driving with a blood alcohol content of .10% or more by weight and two counts of involuntary manslaughter. Defendant received two sentences of seven years, to run concurrently. Defendant appealed.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Fred R. Gamin, for the State.*

*Flanary & Davies, by Kenneth T. Davies, for defendant.*

WELLS, Judge.

### I.

[1] Defendant's first arguments concern the trial court's failure to instruct the jury on the negligence of Brian Lee Keel, Michael Wayne McCarty and Jerry L. Pew.

Contributory negligence is no defense in a criminal action. However, in a case in which defendant is charged with manslaughter by reason of his alleged culpable negligence, the negligence of a person fatally injured, or of a third per-

State v. Hollingsworth

son, is relevant and material on the question of proximate cause. . . .

*State v. Tioran*, 65 N.C. App. 122, 308 S.E. 2d 659 (1983), *citing State v. Harrington*, 260 N.C. 663, 133 S.E. 2d 452 (1963). Therefore, if there is sufficient evidence to create in the minds of the jury a reasonable doubt that the acts of defendant constituted a proximate cause of death, defendant should be acquitted. *State v. Harrington, supra.* In order for negligence of another to insulate defendant from criminal liability, that negligence must be such as to break the causal chain of defendant's negligence; otherwise, defendant's culpable negligence remains *a* proximate cause, sufficient to find him criminally liable. *See State v. Ellis*, 25 N.C. App. 319, 212 S.E. 2d 909 (1975). There may be more than one proximate cause and criminal responsibility arises when the act complained of caused or directly contributed to, that is, proximately caused, the death. *State v. Cummings*, 301 N.C. 374, 271 S.E. 2d 277 (1980).

The negligence of Brian Lee Keel and Michael Wayne McCarty upon which defendant requested a charge to the jury was Keel's and McCarty's voluntary acceptance of a ride with a visibly drunken Hollingsworth at the wheel.[1] While the jury could find negligence on the part of Keel and McCarty, *see Beam v. Parham*, 263 N.C. 417, 139 S.E. 2d 712 (1965), this negligence would be, at most, a *concurring* proximate cause of the deaths of Keel and McCarty, and would not insulate defendant from criminal liability. Thus, the trial court's failure to instruct the jury on this issue was not error.

[2] A different conclusion holds true on the issue of Jerry Pew's negligence. A motorist is required in the exercise of due care to keep a reasonable and proper lookout in the direction of travel and is held to the duty of seeing what he ought to have seen. *Hairston v. Alexander Tank & Equipment Co.*, 310 N.C. 227, 311 S.E. 2d 559 (1984). The failure to do this may break the chain of causation of the original negligent actor. *See id.* Jerry Pew's own testimony was that there was a two to three second time lapse from when he saw the Chevrolet to when he collided with it. De-

---

1. The trial court included in its charge to the jury an instruction that the jury could find that Michael McCarty jerked defendant's steering wheel and that that action could constitute insulating negligence.

fendant testified that the time from when the Chevrolet stalled in the southbound lane to when the collision occurred was five to ten seconds. Samuel Cunningham testified that thirty seconds passed from the time of the scraping of his bumper to the time of the collision in the southbound lane. Defendant also testified that the street was well-lighted. It is unclear whether the Chevrolet's lights were operating at the time and there was no testimony as to weather conditions. The speed limit along that stretch of South Boulevard is forty-five miles per hour.

Even assuming Pew's own evidence as true, there might still have been enough time for him to apply the brakes or swerve around the Chevrolet, neither of which Pew attempted. Whether Pew was negligent and, if so, whether his negligence constituted the *sole* proximate cause of the deaths of Keel and McCarty are questions that are for the jury to decide. *See Hairston v. Alexander Tank & Equipment Co., supra.* The jury should have been instructed to consider the possibility of Jerry Pew's negligence as an insulating cause of the two deaths. For this reason we must grant a new trial.

II.

[3] Defendant next contends that the trial court erred in failing to suppress, as the fruit of an illegal seizure, the blood alcohol test performed on the blood sample taken from the unconscious defendant. This issue is one of first impression in North Carolina and will almost certainly resurface at the new trial; therefore, we consider it here.

The State contends that defendant gave implied consent to the blood test by operation of N.C. Gen. Stat. § 20-16.2 (Cum. Supp. 1981), the "implied consent" statute. The relevant text follows:

20-16.2(a) Any person who drives or operates a motor vehicle upon any highway or any public vehicular area shall be deemed to have given consent . . . to a chemical test or tests of his breath or blood for the purpose of determining the alcoholic content of his blood if arrested for any offense arising out of acts alleged to have been committed while the person was driving or operating a motor vehicle while under the influence of alcoholic beverages. The test or tests shall be

administered at the request of a law-enforcement officer having reasonable grounds to believe the person to have been driving or operating a motor vehicle on a highway or public vehicular area while under the influence of alcoholic beverages. . . .

(b) Any person who is unconscious or who is otherwise in a condition rendering him incapable of refusal shall be deemed not to have withdrawn the consent provided by subsection (a) of this section and the test or tests may be administered. . . .

Though subsection (b) does not specifically refer to an arrest requirement, it does refer to the "consent provided by subsection (a)," which contains the language "if arrested." There is strong support, however, for the proposition that the Legislature's intended focus was upon an officer's having "reasonable grounds" to suspect commission of an "implied consent" offense. *See, e.g., State v. Eubanks*, 283 N.C. 556, 196 S.E. 2d 706 (1973). Requiring the arrest of an unconscious driver would serve no sensible purpose. It has long been established that a blood sample is nontestimonial evidence and that *Miranda* warnings need not be given prior to such a seizure. *See State v. Wright*, 274 N.C. 84, 161 S.E. 2d 581 (1968), *cert. denied*, 396 U.S. 934, 90 S.Ct. 275, 24 L.Ed. 2d 232 (1969). Additional rights granted by G.S. 20-16.2(a)(1), (3) and (4), that defendant has a right to refuse the test, a right to have a qualified person administer an additional blood test, and a right to call an attorney and select a witness within thirty minutes of the notification of his rights, could not be exercised by an unconscious defendant. This fact, plus the provision of subsection (b) that the test may be administered to an unconscious person, indicates that, in such a case, the formal requirements of subsection (a) are not meant to apply. Though not dispositive of legislative intent in 1981, it is interesting to note that 1983 amendments to this statute contain a rewritten subsection (b) that expressly dispenses with the formal requirements of subsection (a) in the case of an unconscious person. 1983 N.C. Sess. Laws, ch. 435.

Although G.S. 20-16.2 operates to imply consent by an unconscious driver to a blood alcohol test, an analysis of the law under the Fourth Amendment of the United States Constitution

and Article I, § 20 of the North Carolina Constitution indicates that consent may not be necessary to seize a blood sample from an unconscious driver. Other jurisdictions have begun their analysis of this question by referring to *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed. 2d 908 (1966). In an opinion acknowledged as "somewhat formalistic" by the Ninth Circuit, *United States v. Harvey,* 701 F. 2d 800 (1983), the Supreme Court found the drawing of blood from an objecting suspect to be permissible under the Fourth Amendment. There was probable cause to believe the defendant was drunk and he was arrested before the blood was drawn. The "seizure" was permitted under the rationale that a search incident to an arrest may be made to uncover concealed weapons or prevent destruction of evidence under the direct control of the accused. Once such a search is permitted, it is "impractical and unnecessary" to confine the search to those objects alone. *United States v. Schmerber, supra.* The facts that probable cause existed to believe defendant had been driving under the influence of alcohol, that blood alcohol begins to diminish shortly after drinking stops, and that extraction of blood is a highly effective and virtually risk- and pain-free method of testing permitted the seizure of blood from defendant's person without a search warrant. Some jurisdictions stop at this point in the analysis and conclude that the lack of an arrest of an unconscious driver precludes a "search incident to an arrest" analysis. *See, e.g., People v. Superior Court of Kern County,* 493 P. 2d 1145 (Cal. 1972); *State v. Richerson,* 535 P. 2d 644, *cert. denied,* 535 P. 2d 657 (N.M. 1975); *Layland v. State,* 535 P. 2d 1043 (Alaska 1975), *overruled on other grounds, Anchorage v. Geber,* 592 P. 2d 1187 (1979); *State v. Towry,* 210 A. 2d 455 (Conn. Super. Ct. 1965).

Other jurisdictions have interpreted *Schmerber* to mean that no arrest is necessary if there exists probable cause to arrest and exigent circumstances, such as the body's dissipation of blood alcohol. *See State v. Mitchell,* 245 So. 2d 618 (Fla. 1971); *State v. McMaster,* 288 A. 2d 583 (N.J. App. Div. 1972); *DeVaney v. State,* 288 N.E. 2d 732 (Ind. 1972).

The better view continues the analysis in light of *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed. 2d 900 (1973). In *Cupp,* police took scrapings from under the fingernails of a man suspected of strangling his wife. The scrapings were taken after defendant began rubbing his hands together behind his back. At

the time he objected to having the scrapings taken and he was not under arrest or in custody. He was not actually arrested until approximately one month later.

The seizure in *Cupp* was also permitted on a rationale similar to that of a search incident to an arrest, even though no arrest had been made. The lack of arrest did not invalidate the search itself, but limited its scope. Defendant was sufficiently apprised of suspicions against him that he was motivated to destroy the evidence, an emergency that justified the limited intrusion of taking fingernail scrapings. *Id.*

The facts in *Cupp* differ from those in the case at bar in two significant respects: (1) while Murphy was conscious and actively objected to the seizure, Hollingsworth was unconscious and unaware of the seizure or the possibility of charges against him; and (2) the drawing of blood is arguably more intrusive than the scraping of fingernails.

In a recent case decided by the Ninth Circuit Court of Appeals, blood samples had been taken from two defendants, one that was conscious and objected to the seizure, and one that was delirious at the time of seizure. *United States v. Harvey, supra.* The court refused to expand *Cupp* to the conscious defendant for two reasons: (1) because extraction of a blood sample is more intrusive than scraping a fingernail and (2) the Supreme Court in *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed. 2d 633 (1980) cited *Cupp* for the proposition that where the formal arrest "followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa." *United States v. Harvey, supra.* The second reason seems to overlook the fact that Murphy was not arrested until a month after the search of his person. *See Cupp v. Murphy, supra.* The formality of arrest helps insure that the police will not arbitrarily invade an individual's privacy, it sharply delineates the moment at which probable cause is determined, and it triggers certain responsibilities of the arresting officer and certain rights of the accused, *e.g., Miranda* rights. *United States v. Harvey, supra.*

The above argument lost its force, however, when the delirious defendant was considered. "There is no compelling reason

why a prior arrest is necessary when it is shown that the suspect could not appreciate the significance of such action." *Id.*

The Supreme Court enumerated three factors that justified the scraping of Murphy's fingernails:

> (1) the existence of probable cause to arrest;

> (2) the limited nature of the intrusion upon the person; and

> (3) the destructibility of the evidence.

*Cupp v. Murphy, supra.*

In determining how these factors affect the present case, we consider the simplest factors first. We find that the extraction of blood, though not so limited as the scraping of fingernails, may still be fairly characterized as a "slight intrusion." *See Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed. 2d 448 (1957). Also, the body's breakdown of alcohol in the blood creates the reasonable risk that the evidence of intoxication will quickly be destroyed. *See Schmerber v. California, supra.*

The most difficult consideration is the issue of whether Officer Tessnier had probable cause to arrest the defendant at the time the blood sample was taken. Involvement in an automobile accident cannot be said *per se* to provide probable cause sufficient to order a blood alcohol test, but defendant's involvement was due first to a miscalculation in judging the distance between his automobile and the Datsun, then to an inability to prevent his high-speed crossing of the median. These circumstances, known to Officer Tessnier before he ordered the blood drawn, indicated an impairment of coordination. Officer Tessnier also smelled the odor of alcohol from the crushed passenger side of defendant's Chevrolet. The two other passengers were not breathing; defendant was gasping for breath. Beer cans on the floor of the car were unopened and could not contribute to the odor. There was no testimony concerning any dampness or puddles that would indicate spilled beer. We hold under these facts that Officer Tessnier had probable cause to arrest defendant at the time the blood sample was drawn.

Therefore, the three criteria of the Cupp test are satisfied and we hold that the blood alcohol test performed on blood seized

from defendant did not violate defendant's rights under the Fourth Amendment of the United States Constitution and Article I, § 20 of the North Carolina Constitution.

Jurisdictions following a similar line of reasoning are numerous. *See, e.g., Aliff v. State,* 627 S.W. 2d 166 (Tex. Cr. App. 1982) (defendant semi-conscious); *Ashley v. State,* 423 So. 2d 1311 (Miss. 1983) (defendant conscious); *People v. Todd,* 322 N.E. 2d 447 (Ill. 1975) (defendant unconscious); *People v. Sutherland,* 683 P. 2d 1192 (Colo. 1984) (defendant conscious).

New trial.

Chief Judge HEDRICK and Judge PHILLIPS concur.