IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA15-940

 Filed: 19 April 2016

Buncombe County, Nos. 14 CRS 80463–64

STATE OF NORTH CAROLINA

 v.

JOSEPH M. ROMANO, Defendant.

 Appeal by the State from an order entered 23 March 2015 by Judge R. Gregory

Horne in Buncombe County Superior Court. Heard in the Court of Appeals 11

February 2016.

 Attorney General Roy Cooper, by Assistant Attorney General Derrick C. Mertz,
 for the State.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender Constance
 E. Widenhouse, for Defendant-Appellee.

 HUNTER, JR., Robert N., Judge.

 The State appeals following an order granting Joseph Mario Romano’s

(Defendant) pre-trial motion to suppress. The State contends the trial court erred in

suppressing blood draw evidence Sergeant Ann Fowler (“Fowler”), of the Asheville

Police Department, collected from a nurse who was treating Defendant. After

appropriate appellate review, we affirm the trial court.

 I. Factual and Procedural Background
 STATE V. ROMANO

 Opinion of the Court

 On 17 February 2014, Defendant was charged with driving while impaired

(“DWI”) and driving while license revoked after receiving a previous impaired driving

revocation notice. On 6 October 2014, a Buncombe County grand jury indicted

Defendant for habitual impaired driving and driving while license revoked after

receiving a previous impaired driving revocation notice.

 On 26 January 2015, Defendant filed a pre-trial motion to suppress. The

record evidence and hearing transcript tended to show the following.

 On 17 February 2014, Asheville police received a call that a white male, age

thirty to thirty-five, wearing a gray sweater backwards, stopped his SUV on Wood

Avenue near Swannanoa River Road. The man got out of the SUV and stumbled

towards the rear entrance of Frank’s Roman Pizza while carrying a large bottle of

liquor.

 Officer Tammy Bryson (“Bryson”), of the Asheville Police Department, went to

the Wood Avenue intersection and found an SUV parked behind another vehicle at a

red light. She searched for the driver while Officer Rick Tullis (“Tullis”) inspected

the SUV. Bryson and Fowler found Defendant sitting behind Frank’s Roman Pizza,

about 400 feet from the SUV, drinking from a 1.75 liter bottle of Montego Bay Light

Rum. He was wearing a gray sweater backwards and he was covered in vomit.

 When Bryson approached, Defendant put the liquor bottle down and staggered

in an attempt to stand up. Bryson told him to sit down. Defendant’s speech was

 -2-
 STATE V. ROMANO

 Opinion of the Court

slurred, his eyes were bloodshot and glassy, and he smelled of alcohol. Then, Bryson

handcuffed Defendant. Defendant became very agitated and cursed at the police. He

looked towards the SUV and saw a tow truck nearby, and yelled, “What are you doing

with my car [expletive]? That’s my car.”

 Fowler asked Defendant to complete field sobriety tests but he was

“belligerent” and “would not follow instructions.” Fowler kept trying to stand

Defendant upright but he kept falling down, and Fowler quit trying to conduct the

sobriety tests because it was “unsafe.” Fowler administered a roadside portable alco-

sensor and it indicated Defendant was impaired by alcohol.

 Tullis inspected the SUV and found the hood was still warm and there were no

keys inside the SUV. He checked the vehicle’s registration and discovered it belonged

to Defendant. The keys to the SUV were found in Defendant’s left pants pocket.

 The police officers called an ambulance, and another officer, Officer Loiacono,

rode in the ambulance with Defendant to the hospital. Bryson followed the

ambulance to the hospital. Fowler stayed at the intersection until the SUV was

towed, and then went to the hospital.

 At the hospital, Defendant became “combative,” kicking and spitting while

hospital staff tried to treat him. Fowler talked to Defendant and calmed him down

for moments at a time, but he then became “irate . . . to the point that the hospital

[staff] had to give him medication to calm him down.”

 -3-
 STATE V. ROMANO

 Opinion of the Court

 Fowler described the following: “[The nurse] knew we wanted to draw blood

sooner or later. We had to wait until [Defendant] calmed down. Once he was sedated,

he was out, and the hospital was drawing their blood [sic], [the nurse] had drawn

enough [blood] to where we could use what she had drawn.” This happened, as Fowler

described, “[p]retty much right off the bat. They knew he was a DWI [sic]. They knew

that he was going to be physically arrested, and we would have somebody with him

until he was released from the hospital.” Once Defendant was sedated, Fowler and

Bryson stepped out of the hospital room.

 Fowler testified she “always” tries to collect a chemical analysis of a suspect’s

blood alcohol level when they are suspected of DWI. According to her, collection is

dependent upon “the [suspect’s] willingness . . . who has the evidence inside their

body, if [sic] they are willing to give that evidence to [police] or not.” Defense counsel

asked her, “Did you think you would be able to get a blood sample [from Defendant?]”

She answered, “If not, I would have gotten a search warrant.” Fowler did not attempt

to get a search warrant for Defendant’s blood at any point, nor did she direct any of

her subordinate officers to obtain a search warrant.

 Rather, Fowler waited until the nurse drew a “large [vial] of blood.” The nurse

told Fowler that the police could use the blood and Fowler said to her, “Let me make

sure [Defendant] is unconscious.” Fowler confirmed Defendant was sedated and

unconscious and “advised him of his rights.” She “attempted to wake [Defendant] up

 -4-
 STATE V. ROMANO

 Opinion of the Court

to get a verbal response from him, but he did not respond to [her].” Nevertheless, she

took possession of the excess blood the nurse had drawn.

 Defendant was never conscious to be advised of his rights, and consequently,

he never refused the blood draw or signed an advice of rights form. None of the police

officers obtained a search warrant from the magistrate’s office, which is “a couple of

miles” from the hospital.

 The parties were heard on Defendant’s motion to suppress on 2 February 2015.

In addition to his motion to suppress the blood evidence, Defendant moved to

suppress the discovery of his driver’s license and SUV keys, which the trial court

denied. In a 23 March 2015 order, the trial court granted Defendant’s motion to

suppress the blood evidence. The trial court made the following findings of fact, inter

alia:

 5. Upon arrival at the hospital, the Defendant remained
 belligerent and also became combative toward the medical
 staff and the officers present. He fought with the staff by
 flailing about, spitting and kicking. The medial staff had
 to tie his hands down and the officers attempted to
 physically restrain his legs. . . .

 6. Sgt. Fowler discussed with the treating nurse that she
 would likely need a blood draw for law enforcement
 purposes;

 7. At some point prior to any blood draw, the medical staff
 determined it was necessary to medicate the Defendant in
 order to calm him down. Prior to this point, the Defendant
 had not lost consciousness and was in no way cooperative
 with medical staff or law enforcement. Sgt. Fowler had not

 -5-
 STATE V. ROMANO

 Opinion of the Court

yet advised the Defendant of his chemical analysis rights
nor had she requested that he submit[] to a blood draw;

8. After being medicated, the Defendant lost consciousness
to some degree. The restraints were then removed and
physical restraint by medical staff or law enforcement
personnel was no longer necessary. Sgt. Fowler left the
hospital room for some period of time and, in her absence,
the treating nurse drew blood from the Defendant at 4:47
[p.m.]. This blood draw was for medical treatment
purposes, but the nurse drew additional blood beyond what
was needed for medical treatment purposes. When Sgt.
Fowler returned to the hospital room, the nurse offered her
the additional blood for law enforcement use. Sgt. Fowler
initially declined receipt of the blood on the basis that she
first wanted to see if the Defendant would consent to the
blood draw or receipt of the evidence. To that end, Sgt.
Fowler attempted to advise the Defendant of his chemical
analysis rights at 4:50 [p.m.], less than fifty minutes after
his transport to the hospital. Sgt. Fowler found the
Defendant to be in an unconscious state at the time and
she was unable to wake him up. Based upon his
unconscious state, Sgt. Fowler then took custody of the
excess blood for law enforcement testing purposes. Due to
his medically induced state, the Defendant was rendered
unable to meaningfully receive and consider his blood test
rights, unable to give or withhold his informed consent,
and/or unable to exercise his right to refuse the
warrantless test;

9. Sgt. Fowler expressly relied upon . . . . [N.C. Gen. Stat.]
§ 20-16.2(b) wherein a person who is unconscious or
otherwise in a condition that makes the person incapable
of refusal may be tested. As such, Sgt. Fowler did not
obtain, or attempt to obtain, a search warrant prior to
taking custody of the blood sample. Sgt. Fowler did not
believe that any exigency existed, instead she relied on the
statutory per se exception;

10. At all relevant times during the encounter, there were

 -6-
 STATE V. ROMANO

 Opinion of the Court

 multiple law enforcement officers present and available to
 assist with the investigation both at the scene and later at
 the hospital. . . . There were a sufficient number of officers
 present such that an officer could have left to drive the
 relatively short distance (only a few miles) to the
 Buncombe County Magistrate’s Office to obtain a search
 warrant. There were Magistrates on-duty and available at
 the time. Sgt. Fowler was familiar with the search warrant
 procedure and had previously obtained blood search
 warrants in other cases. The “blood draw” search warrant
 utilizes a fill-in-the-blank form and is not a time-
 consuming process. The Defendant was purposefully
 rendered into an unconscious or sedated state by the
 medical intervention. The Defendant never consented to
 any blood draw or to law enforcement taking possession of
 his blood. . . .

 13. Pursuant to Missouri v. McNeely, [___ U.S. ___,] 133 S.
 Ct. 1552 (2013), “a warrantless search of the person is
 reasonable only if it falls within a recognized exception.”

Based upon these findings of fact and the totality of the circumstances, the trial court

concluded “no exigency existed justifying a warrantless search.” Further, the trial

court concluded that N.C. Gen. Stat. § 20-16.2(b), as applied in this case, violated

Missouri v. McNeely. Accordingly, the trial court suppressed the blood draw evidence.

The State timely appealed the trial court’s order.

 On appeal, the State challenges finding of fact 10 “to the extent it suggests

[Defendant] refused or withdrew consent . . . and to the extent it offers a legal

conclusion on the issue of consent or implied consent.”

 II. Standard of Review

 -7-
 STATE V. ROMANO

 Opinion of the Court

 Our review of a trial court’s denial of a motion to suppress is “strictly limited

to determining whether the trial judge’s underlying findings of fact are supported by

competent evidence, in which event they are conclusively binding on appeal, and

whether those factual findings in turn support the judge’s ultimate conclusions of

law.” State v. Cooke, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). “The trial court’s

conclusions of law . . . are fully reviewable on appeal.” State v. Hughes, 353 N.C. 200,

208, 539 S.E.2d 625, 631 (2000). “[T]he trial court’s ruling on a motion to suppress is

afforded great deference upon appellate review as it has the duty to hear testimony

and weigh the evidence.” State v. McClendon, 130 N.C. App. 368, 377, 502 S.E.2d

902, 908 (1998) (citation omitted).

 III. Analysis

 The Fourth Amendment protects the “right of the people to be secure in their

persons, house, papers, and effects, against unreasonable searches and seizures . . .

and no Warrants shall issue, but upon probable cause . . . .” U.S. Const. amend. IV.

Our State Constitution protects these same rights by prohibiting general warrants,

which “are dangerous to liberty.” N.C. Const. art. I, section 20.

 It is a “basic constitutional rule” that “searches conducted outside the judicial

process, without prior approval by [a] judge or magistrate, are per se unreasonable

under the Fourth Amendment—subject only to a few specifically established and well

delineated exceptions.” Coolidge v. New Hampshire, 403 U.S. 443, 454–55 (1971).

 -8-
 STATE V. ROMANO

 Opinion of the Court

These exceptions are jealously and carefully drawn. Id. at 455; see also Jones v. U.S.,

357 U.S. 493, 499 (1958). The party seeking the exception to the warrant requirement

bears the burden of showing “the exigencies of the situation made that [warrantless]

course imperative.” Coolidge, 403 U.S. at 455. The exigent circumstances doctrine

“applies when the exigencies of the situation make the needs of law enforcement so

compelling that a warrantless search is objectively reasonable under the Fourth

Amendment.” Missouri v. McNeely, ___ U.S. ___, ___, 133 S. Ct. 1552, 1558 (2013).

 These principles apply to blood draw searches in DWI cases, which involve

physical intrusion into a defendant’s veins. Id. ___ U.S. at ___, 133 S. Ct. at 1554.

This “invasion of bodily integrity implicates an individual’s ‘most personal and deep-

rooted expectations of privacy.’” Id. ___ U.S. at ___, 133 S. Ct. at 1558 (quoting

Winston v. Lee, 470 U.S. 753, 760 (1985); Skinner v. Railway Labor Executives’ Assn.,

489 U.S. 602, 616 (1989)). The United States Supreme Court has held “the natural

metabolization of alcohol in the bloodstream” does not present a “per se exigency that

justifies an exception to the Fourth Amendment’s warrant requirement for

nonconsensual blood testing in all drunk-driving cases.” McNeely, ___ U.S. at ___,

133 S. Ct. at 1556. Rather, “exigency in this context must be determined case by case

based on the totality of the circumstances.” Id.

 Under North Carolina’s Uniform Driver’s License Act, all drivers who “drive[]

a vehicle on a highway or public vehicular area” give “consent to a chemical analysis”

 -9-
 STATE V. ROMANO

 Opinion of the Court

if they are “charged with an implied-consent offense.” N.C. Gen. Stat. § 20-16.2(a)

(2015). “Any law enforcement officer who has reasonable grounds to believe that the

person charged has committed the implied-consent offense may obtain a chemical

analysis of the person.” Id. Before the chemical analysis can be administered, the

person charged must be taken before a chemical analyst or a law enforcement officer

authorized to administer chemical analysis, both of whom must inform the person

orally and in writing of the following:

 (1) You have been charged with an implied-consent offense.
 Under the implied-consent law, you can refuse any test, but
 your driver[’]s license will be revoked for one year and
 could be revoked for a longer period of time under certain
 circumstances, and an officer can compel you to be tested
 under other laws.

 (2) [repealed]

 (3) The test results, or the fact of your refusal, will be
 admissible in evidence at trial.

 (4) Your driving privilege will be revoked immediately for
 at least 30 days if you refuse any test or the test result is
 0.08 or more, 0.04 or more if you were driving a commercial
 vehicle, or 0.01 or more if you are under the age of 21.

 (5) After you are released, you may seek your own test in
 addition to this test.

 (6) You may call an attorney for advice and select a witness
 to view the testing procedures remaining after the witness
 arrives, but the testing may not be delayed for these
 purposes longer than 30 minutes from the time you are
 notified of these rights. You must take the test at the end
 of 30 minutes even if you have not contacted an attorney or

 - 10 -
 STATE V. ROMANO

 Opinion of the Court

 your witness has not arrived.

Id. (2015).

 Fowler did not advise Defendant of these rights, and did not obtain his written

or oral consent to the blood test. Rather, she waited until an excess of blood was

drawn, beyond the amount needed for medical treatment, and procured it from the

attending nurse. Fowler testified that she believed her actions were reasonable under

N.C. Gen. Stat. § 20-16.2(b), which provides the following:

 (b) Unconscious Person May Be Tested—If a law
 enforcement officer has reasonable grounds to believe that
 a person has committed an implied-consent offense, and
 the person is unconscious or otherwise in a condition that
 makes the person incapable of refusal, the law enforcement
 officer may direct the taking of a blood sample or may
 direct the administration of any other chemical analysis
 that may be effectively performed. In this instance the
 notification of rights set out in subsection (a) and the
 request required by subsection (c) are not necessary.

N.C. Gen. Stat. § 20-16.2(b) (2015).

 It is true, as the State contends, that this Court has affirmed the use of N.C.

Gen. Stat. § 20-16.2(b) to justify warrantless blood draws of unconscious DWI

defendants. See State v. Hollingsworth, 77 N.C. App. 36, 334 S.E.2d 463 (1985); see

also State v. Garcia-Lorenzo, 110 N.C. App. 319, 430 S.E.2d 290 (1993). However,

these cases did not have the benefit of the United States Supreme Court’s guidance

in McNeely, which sharply prohibits per se warrant exceptions for blood draw

searches.

 - 11 -
 STATE V. ROMANO

 Opinion of the Court

 Applying section 20-16.2(b) to the case sub judice, the record suggests, but does

not affirmatively show, that Fowler had “reasonable grounds” to believe Defendant

committed the implied consent offense of DWI. Reasonable grounds are the

equivalent of probable cause in this context. See Moore v. Hodges, 116 N.C. App. 727,

729–30, 449 S.E.2d 218, 220 (1994) (citations omitted). It is undisputed that

Defendant owned the SUV and possessed the keys. However, when Bryson and

Fowler found him behind Frank’s Roman Pizza, he was actively drinking rum. The

record does not affirmatively show Defendant was intoxicated while he drove his

SUV; rather, it raises a question as to whether he became very intoxicated while

drinking rum during and/or after his 400-foot walkabout to Frank’s Roman Pizza.

More importantly, Fowler testified that she did not attempt to obtain a search

warrant at any time, even though the magistrate’s office was “a couple of miles” away

from the hospital. Additionally, she did not direct the nurse or any other qualified

person to draw Defendant’s blood.

 The State’s post hoc actions do not overcome the presumption that the

warrantless search is unreasonable, and it offends the Fourth Amendment, the State

Constitution, and McNeely. As the party seeking the warrant exception, the State

did not carry its burden in proving “the exigencies of the situation made that

[warrantless] course imperative.” Coolidge, 403 U.S. at 455. Under the totality of

the circumstances, considering the alleged exigencies of the situation, the

 - 12 -
 STATE V. ROMANO

 Opinion of the Court

warrantless blood draw was not objectively reasonable. See McNeely, ___ U.S. at ___,

133 S. Ct. at 1558. Therefore, we hold the trial court’s findings of fact are supported

by competent evidence, and they support the trial court’s conclusions of law.

 Lastly, for the first time on appeal, the State contends the blood should be

admitted under the independent source doctrine, or alternatively, through the good

faith exception.

 “The independent source doctrine permits the introduction of evidence initially

discovered, or as a consequence of, an unlawful search, but later obtained

independently from lawful activities untainted by the initial illegality.” State v.

Robinson, 148 N.C. App. 422, 429, 560 S.E.2d 154, 159 (2002) (citation omitted). The

sequence of events in this case does not follow this framework. Moreover, Fowler’s

testimony shows the nurse knew the officers “wanted to draw blood sooner or later,”

that “[Defendant] was a DWI [sic],” and that Defendant was going to be arrested.

Therefore, the nurse cannot be an independent lawful source.

 The good faith exception allows police officers to objectively and reasonably

rely on a magistrate’s warrant that is later found to be invalid. See U.S. v. Leon, 468

U.S. 897 (1984). In the case sub judice, the officers never attempted to obtain a search

warrant prior to the blood draw, and they cannot objectively and reasonably rely on

the good faith exception.

 IV. Conclusion

 - 13 -
 STATE V. ROMANO

 Opinion of the Court

For the foregoing reasons we affirm the trial court.

Affirmed.

Judges STEPHENS and INMAN concur.

 - 14 -