HUNTER, JR., ROBERT N., Judge.
*212 The State appeals following an order granting Joseph Mario Romano's (Defendant) pre-trial motion to suppress. The State contends the trial court erred in suppressing blood draw evidence Sergeant Ann Fowler ("Fowler"), of the Asheville Police Department, collected from a nurse who was treating Defendant. After appropriate appellate review, we affirm the trial court.
I. Factual and Procedural Background
On 17 February 2014, Defendant was charged with driving while impaired ("DWI") and driving while license revoked after receiving a *213 previous impaired driving revocation notice. On 6 October 2014, a Buncombe County grand jury indicted Defendant for habitual impaired driving and driving while license revoked after receiving a previous impaired driving revocation notice.
On 26 January 2015, Defendant filed a pre-trial motion to suppress. The record evidence and hearing transcript tended to show the following.
On 17 February 2014, Asheville police received a call that a white male, age thirty to thirty-five, wearing a gray sweater backwards, stopped his SUV on Wood Avenue near Swannanoa River Road. The man got out of the SUV and stumbled towards the rear entrance of Frank's Roman Pizza while carrying a large bottle of liquor.
Officer Tammy Bryson ("Bryson"), of the Asheville Police Department, went to the Wood Avenue intersection and found an SUV parked behind another vehicle at a red light. She searched for the driver while Officer Rick Tullis ("Tullis") inspected the SUV. Bryson and Fowler found Defendant sitting behind Frank's Roman Pizza, about 400 feet from the SUV, drinking from a 1.75 liter bottle of Montego Bay Light Rum. He was wearing a gray sweater backwards and he was covered in vomit.
When Bryson approached, Defendant put the liquor bottle down and staggered in an attempt to stand up. Bryson told him to sit down. Defendant's speech was slurred, his eyes were bloodshot and glassy, and he smelled of alcohol. Then, Bryson handcuffed Defendant. Defendant became very agitated and cursed at the police. He looked towards the SUV and saw a tow truck nearby, and yelled, "What are you doing with my car [expletive]? That's my car."
Fowler asked Defendant to complete field sobriety tests but he was "belligerent" and "would not follow instructions." Fowler kept trying to stand Defendant upright but he kept falling down, and Fowler quit trying to conduct the sobriety tests because it was "unsafe." Fowler administered a roadside portable alco-sensor and it indicated Defendant was impaired by alcohol.
Tullis inspected the SUV and found the hood was still warm and there were no keys inside the SUV. He checked the vehicle's registration and discovered it belonged to *171 Defendant. The keys to the SUV were found in Defendant's left pants pocket.
The police officers called an ambulance, and another officer, Officer Loiacono, rode in the ambulance with Defendant to the hospital. Bryson *214 followed the ambulance to the hospital. Fowler stayed at the intersection until the SUV was towed, and then went to the hospital.
At the hospital, Defendant became "combative," kicking and spitting while hospital staff tried to treat him. Fowler talked to Defendant and calmed him down for moments at a time, but he then became "irate ... to the point that the hospital [staff] had to give him medication to calm him down."
Fowler described the following: "[The nurse] knew we wanted to draw blood sooner or later. We had to wait until [Defendant] calmed down. Once he was sedated, he was out, and the hospital was drawing their blood [sic], [the nurse] had drawn enough [blood] to where we could use what she had drawn." This happened, as Fowler described, "[p]retty much right off the bat. They knew he was a DWI [sic]. They knew that he was going to be physically arrested, and we would have somebody with him until he was released from the hospital." Once Defendant was sedated, Fowler and Bryson stepped out of the hospital room.
Fowler testified she "always" tries to collect a chemical analysis of a suspect's blood alcohol level when they are suspected of DWI. According to her, collection is dependent upon "the [suspect's] willingness ... who has the evidence inside their body, if [sic] they are willing to give that evidence to [police] or not." Defense counsel asked her, "Did you think you would be able to get a blood sample [from Defendant?]" She answered, "If not, I would have gotten a search warrant." Fowler did not attempt to get a search warrant for Defendant's blood at any point, nor did she direct any of her subordinate officers to obtain a search warrant.
Rather, Fowler waited until the nurse drew a "large [vial] of blood." The nurse told Fowler that the police could use the blood and Fowler said to her, "Let me make sure [Defendant] is unconscious." Fowler confirmed Defendant was sedated and unconscious and "advised him of his rights." She "attempted to wake [Defendant] up to get a verbal response from him, but he did not respond to [her]." Nevertheless, she took possession of the excess blood the nurse had drawn.
Defendant was never conscious to be advised of his rights, and consequently, he never refused the blood draw or signed an advice of rights form. None of the police officers obtained a search warrant from the magistrate's office, which is "a couple of miles" from the hospital.
The parties were heard on Defendant's motion to suppress on 2 February 2015. In addition to his motion to suppress the blood *215 evidence, Defendant moved to suppress the discovery of his driver's license and SUV keys, which the trial court denied. In a 23 March 2015 order, the trial court granted Defendant's motion to suppress the blood evidence. The trial court made the following findings of fact, inter alia:
5. Upon arrival at the hospital, the Defendant remained belligerent and also became combative toward the medical staff and the officers present. He fought with the staff by flailing about, spitting and kicking. The medial staff had to tie his hands down and the officers attempted to physically restrain his legs....
6. Sgt. Fowler discussed with the treating nurse that she would likely need a blood draw for law enforcement purposes;
7. At some point prior to any blood draw, the medical staff determined it was necessary to medicate the Defendant in order to calm him down. Prior to this point, the Defendant had not lost consciousness and was in no way cooperative with medical staff or law enforcement. Sgt. Fowler had not yet advised the Defendant of his chemical analysis rights nor had she requested that he submit [ ] to a blood draw;
8. After being medicated, the Defendant lost consciousness to some degree. The restraints were then removed and physical restraint by medical staff or law enforcement personnel was no longer necessary. Sgt. Fowler left the hospital room for some period of time and, in her absence, the *172 treating nurse drew blood from the Defendant at 4:47 [p.m.]. This blood draw was for medical treatment purposes, but the nurse drew additional blood beyond what was needed for medical treatment purposes. When Sgt. Fowler returned to the hospital room, the nurse offered her the additional blood for law enforcement use. Sgt. Fowler initially declined receipt of the blood on the basis that she first wanted to see if the Defendant would consent to the blood draw or receipt of the evidence. To that end, Sgt. Fowler attempted to advise the Defendant of his chemical analysis rights at 4:50 [p.m.], less than fifty minutes after his transport to the hospital. Sgt. Fowler found the Defendant to be in an unconscious state at the time and she was unable to wake him up. Based upon his unconscious state, Sgt. Fowler then took custody of the *216 excess blood for law enforcement testing purposes. Due to his medically induced state, the Defendant was rendered unable to meaningfully receive and consider his blood test rights, unable to give or withhold his informed consent, and/or unable to exercise his right to refuse the warrantless test;
9. Sgt. Fowler expressly relied upon.... [N.C. Gen. Stat.] § 20-16.2(b) wherein a person who is unconscious or otherwise in a condition that makes the person incapable of refusal may be tested. As such, Sgt. Fowler did not obtain, or attempt to obtain, a search warrant prior to taking custody of the blood sample. Sgt. Fowler did not believe that any exigency existed, instead she relied on the statutory per se exception;
10. At all relevant times during the encounter, there were multiple law enforcement officers present and available to assist with the investigation both at the scene and later at the hospital.... There were a sufficient number of officers present such that an officer could have left to drive the relatively short distance (only a few miles) to the Buncombe County Magistrate's Office to obtain a search warrant. There were Magistrates on-duty and available at the time. Sgt. Fowler was familiar with the search warrant procedure and had previously obtained blood search warrants in other cases. The "blood draw" search warrant utilizes a fill-in-the-blank form and is not a time-consuming process. The Defendant was purposefully rendered into an unconscious or sedated state by the medical intervention. The Defendant never consented to any blood draw or to law enforcement taking possession of his blood....
13. Pursuant to Missouri v. McNeely, [--- U.S. ----,] 133 S.Ct. 1552 [185 L.Ed.2d 696] (2013), "a warrantless search of the person is reasonable only if it falls within a recognized exception."
Based upon these findings of fact and the totality of the circumstances, the trial court concluded "no exigency existed justifying a warrantless search." Further, the trial court concluded that N.C. Gen.Stat. § 20-16.2(b), as applied in this case, violated Missouri v. McNeely. Accordingly, the trial court suppressed the blood draw evidence. The State timely appealed the trial court's order.
*217 On appeal, the State challenges finding of fact 10 "to the extent it suggests [Defendant] refused or withdrew consent ... and to the extent it offers a legal conclusion on the issue of consent or implied consent."
II. Standard of Review
Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." State v. Cooke, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "The trial court's conclusions of law ... are fully reviewable on appeal." State v. Hughes, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000). "[T]he trial court's ruling on a motion to suppress is afforded great deference upon appellate review as it has the duty to hear testimony and weigh the evidence." State v. McClendon, 130 N.C.App. 368, 377, 502 S.E.2d 902, 908 (1998) (citation omitted).
III. Analysis
The Fourth Amendment protects the "right of the people to be secure in their *173 persons, house, papers, and effects, against unreasonable searches and seizures ... and no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. Our State Constitution protects these same rights by prohibiting general warrants, which "are dangerous to liberty." N.C. Const. art. I, section 20.
It is a "basic constitutional rule" that "searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions." Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). These exceptions are jealously and carefully drawn. Id. at 455, 91 S.Ct. 2022 ; see also Jones v. U.S., 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). The party seeking the exception to the warrant requirement bears the burden of showing "the exigencies of the situation made that [warrantless] course imperative." Coolidge, 403 U.S. at 455, 91 S.Ct. 2022. The exigent circumstances doctrine "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." Missouri v. McNeely, ---U.S. ----, ----, 133 S.Ct. 1552, 1558, 185 L.Ed.2d 696 (2013).
These principles apply to blood draw searches in DWI cases, which involve physical intrusion into a defendant's veins. Id. - -- U.S. at ----, 133 S.Ct. at 1554. This "invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.' "
*218 Id. --- U.S. at ----, 133 S.Ct. at 1558 (quoting Winston v. Lee, 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) ; Skinner v. Railway Labor Executives' Assn., 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ). The United States Supreme Court has held "the natural metabolization of alcohol in the bloodstream" does not present a "per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." McNeely, --- U.S. at ----, 133 S.Ct. at 1556. Rather, "exigency in this context must be determined case by case based on the totality of the circumstances." Id.
Under North Carolina's Uniform Driver's License Act, all drivers who "drive [ ] a vehicle on a highway or public vehicular area" give "consent to a chemical analysis" if they are "charged with an implied-consent offense." N.C. Gen.Stat. § 20-16.2(a) (2015). "Any law enforcement officer who has reasonable grounds to believe that the person charged has committed the implied-consent offense may obtain a chemical analysis of the person." Id. Before the chemical analysis can be administered, the person charged must be taken before a chemical analyst or a law enforcement officer authorized to administer chemical analysis, both of whom must inform the person orally and in writing of the following:
(1) You have been charged with an implied-consent offense. Under the implied-consent law, you can refuse any test, but your driver[']s license will be revoked for one year and could be revoked for a longer period of time under certain circumstances, and an officer can compel you to be tested under other laws.
(2) [repealed]
(3) The test results, or the fact of your refusal, will be admissible in evidence at trial.
(4) Your driving privilege will be revoked immediately for at least 30 days if you refuse any test or the test result is 0.08 or more, 0.04 or more if you were driving a commercial vehicle, or 0.01 or more if you are under the age of 21.
(5) After you are released, you may seek your own test in addition to this test.
(6) You may call an attorney for advice and select a witness to view the testing procedures remaining after the witness arrives, but the testing may not be delayed for these purposes longer than 30 minutes from the time you *219 are notified of these rights. You must take the test at the end of 30 minutes even if you have not contacted an attorney or your witness has not arrived.
Id. (2015).
Fowler did not advise Defendant of these rights, and did not obtain his written or oral *174 consent to the blood test. Rather, she waited until an excess of blood was drawn, beyond the amount needed for medical treatment, and procured it from the attending nurse. Fowler testified that she believed her actions were reasonable under N.C. Gen.Stat. § 20-16.2(b), which provides the following:
(b) Unconscious Person May Be Tested-If a law enforcement officer has reasonable grounds to believe that a person has committed an implied-consent offense, and the person is unconscious or otherwise in a condition that makes the person incapable of refusal, the law enforcement officer may direct the taking of a blood sample or may direct the administration of any other chemical analysis that may be effectively performed. In this instance the notification of rights set out in subsection (a) and the request required by subsection (c) are not necessary.
N.C. Gen.Stat. § 20-16.2(b) (2015).
It is true, as the State contends, that this Court has affirmed the use of N.C. Gen.Stat. § 20-16.2(b) to justify warrantless blood draws of unconscious DWI defendants. See State v. Hollingsworth, 77 N.C.App. 36, 334 S.E.2d 463 (1985) ; see also State v. Garcia-Lorenzo, 110 N.C.App. 319, 430 S.E.2d 290 (1993). However, these cases did not have the benefit of the United States Supreme Court's guidance in McNeely, which sharply prohibits per se warrant exceptions for blood draw searches.
Applying section 20-16.2(b) to the case sub judice, the record suggests, but does not affirmatively show, that Fowler had "reasonable grounds" to believe Defendant committed the implied consent offense of DWI. Reasonable grounds are the equivalent of probable cause in this context. See Moore v. Hodges, 116 N.C.App. 727, 729-30, 449 S.E.2d 218, 220 (1994) (citations omitted). It is undisputed that Defendant owned the SUV and possessed the keys. However, when Bryson and Fowler found him behind Frank's Roman Pizza, he was actively drinking rum. The record does not affirmatively show Defendant was intoxicated while he drove his SUV; rather, it raises a question as to whether he became very intoxicated while drinking rum during and/or after his 400-foot *220 walkabout to Frank's Roman Pizza. More importantly, Fowler testified that she did not attempt to obtain a search warrant at any time, even though the magistrate's office was "a couple of miles" away from the hospital. Additionally, she did not direct the nurse or any other qualified person to draw Defendant's blood.
The State's post hoc actions do not overcome the presumption that the warrantless search is unreasonable, and it offends the Fourth Amendment, the State Constitution, and McNeely. As the party seeking the warrant exception, the State did not carry its burden in proving "the exigencies of the situation made that [warrantless] course imperative." Coolidge, 403 U.S. at 455, 91 S.Ct. 2022. Under the totality of the circumstances, considering the alleged exigencies of the situation, the warrantless blood draw was not objectively reasonable. See McNeely, --- U.S. at ----, 133 S.Ct. at 1558. Therefore, we hold the trial court's findings of fact are supported by competent evidence, and they support the trial court's conclusions of law.
Lastly, for the first time on appeal, the State contends the blood should be admitted under the independent source doctrine, or alternatively, through the good faith exception.
"The independent source doctrine permits the introduction of evidence initially discovered, or as a consequence of, an unlawful search, but later obtained independently from lawful activities untainted by the initial illegality." State v. Robinson, 148 N.C.App. 422, 429, 560 S.E.2d 154, 159 (2002) (citation omitted). The sequence of events in this case does not follow this framework. Moreover, Fowler's testimony shows the nurse knew the officers "wanted to draw blood sooner or later," that "[Defendant] was a DWI [sic]," and that Defendant was going to be arrested. Therefore, the nurse cannot be an independent lawful source.
The good faith exception allows police officers to objectively and reasonably rely on a magistrate's warrant that is later found to be invalid. See *175 U.S. v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In the case sub judice, the officers never attempted to obtain a search warrant prior to the blood draw, and they cannot objectively and reasonably rely on the good faith exception.
IV. Conclusion
For the foregoing reasons we affirm the trial court.
Affirmed.
Judges STEPHENS and INMAN concur.