IN THE SUPREME COURT OF NORTH CAROLINA

No. 199PA16

Filed 9 June 2017

STATE OF NORTH CAROLINA

v.

JOSEPH MARIO ROMANO

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 785 S.E.2d 168 (2016), affirming an order entered on 23 March 2015 by Judge R. Gregory Horne in Superior Court, Buncombe County. On 18 August 2016, the Supreme Court allowed defendant's conditional petition for discretionary review as to additional issues. Heard in the Supreme Court on 20 March 2017.

*Joshua H. Stein, Attorney General, by Derrick C. Mertz, Special Deputy Attorney General, for the State-appellant/appellee.*

*Glenn Gerding, Appellate Defender, by Constance E. Widenhouse and Andrew DeSimone, Assistant Appellate Defenders, for defendant-appellant/appellee.*

BEASLEY, Justice.

The issue before us in this case is whether N.C.G.S. § 20-16.2(b), which authorizes law enforcement to obtain a blood sample from an unconscious defendant who is suspected of driving while impaired without first obtaining a search warrant, was unconstitutionally applied to defendant. The trial court suppressed the results of defendant's blood test on Fourth Amendment grounds, and the Court of Appeals

affirmed that decision. We now affirm the opinion of the Court of Appeals as modified herein.

On 6 October 2014, defendant was indicted for felony habitual driving while impaired and driving while his license was revoked. These charges were based on events that occurred on 17 February 2014. On 26 January 2015, defendant filed a pretrial motion to suppress all evidence gathered after his arrest. The motion was heard on 2 and 3 February 2015.

Based on the evidence presented at the suppression hearing, the trial court found the following facts. On 17 February 2014, Officer Tammy Bryson responded to a dispatch indicating that a white male wearing his sweater backwards and carrying a liquor bottle had stopped his SUV in the travel portion of a public road, gotten out of the vehicle, and stumbled across the multilane highway. Officer Bryson found Joseph Romano (defendant), who matched the description of the driver, sitting behind a restaurant "approximately 400 feet from the abandoned SUV." Officer Bryson observed that defendant was making incoherent statements, that his speech was slurred, that he was unable to stand due to his obvious intoxication, and that he smelled strongly of alcohol and vomit. Officer Bryson determined that defendant's faculties were appreciably impaired. Defendant was arrested for driving while impaired (DWI), and, due to his extreme level of intoxication, defendant was

transported to a hospital for medical treatment. Officer Bryson requested the assistance of Sergeant Ann Fowler, a Drug Recognition Expert.

Defendant was belligerent and combative throughout his encounters with law enforcement and medical personnel. At the hospital, medical staff and law enforcement attempted to restrain defendant. Medical personnel determined it was necessary to medicate defendant to calm him down. Sergeant Fowler told the treating nurse "that she would likely need a blood draw for law enforcement purposes." Before defendant was medicated, Sergeant Fowler did not "advise[ ] [him] of his chemical analysis rights," "request[ ] that he submit[ ] to a blood draw," or obtain a warrant for a blood search. After defendant was medically subdued, the treating nurse drew blood for medical treatment purposes; however, the nurse drew more blood than was needed for treatment purposes and offered the additional blood for law enforcement use. Before accepting the blood sample, Sergeant Fowler attempted to get defendant's consent to the blood draw or receipt of the evidence, but she was unable to wake him. The trial court found as fact that "[d]ue to his medically induced state, the Defendant was rendered unable to meaningfully receive and consider his blood test rights, unable to give or withhold his informed consent, and/or unable to exercise his right to refuse the warrantless test."

During this entire series of events, multiple officers were present to assist with the investigation, "such that an officer could have left to drive the relatively short

distance (only a few miles) to the Buncombe County Magistrate's Office to obtain a search warrant." Sergeant Fowler was familiar with the blood search warrant procedure, and search warrants for a blood draw are fill-in-the-blank forms that are not time-consuming; moreover, magistrates were on duty and available during the relevant time period. Sergeant Fowler did not attempt to obtain a warrant for defendant's blood nor did she believe any exigency existed. Instead, she "expressly relied upon the statutory authorization set forth in [subsection] 20-16.2(b)," which allows the taking and testing of blood from a person who has committed a DWI if the person is "unconscious or otherwise in a condition that makes the person incapable of refusal." After taking possession of defendant's blood, Sergeant Fowler "drove to the Buncombe County Magistrate's Office and swore out warrants for the present charges," and then returned to the hospital and served the warrants on defendant. The trial court found that "nothing prevent[ed] her from obtaining a search warrant [for defendant's blood] at the same time she [obtained the other warrants] and then subsequently seizing the blood."

The trial court quoted *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552 (2013), which states that "a warrantless search of the person is reasonable only if it falls within a recognized exception," such as "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Id*. at ___, 133 S. Ct. at 1558 (citations omitted). A court "looks to the totality of circumstances" to determine

whether exigent circumstances justified law enforcement in acting without a warrant. *Id.* at ___, 133 S. Ct. at 1559 (citations omitted).

The trial court concluded as a matter of law that the seizure of defendant's blood "was a search subject to Fourth Amendment protection," and, under "a totality of the circumstances test, no exigency existed justifying a warrantless search." The court concluded that N.C.G.S. § 20-16.2(b) "creates a per se exigency exception to the warrant requirement," and as applied here violates the holding in *McNeely*. Therefore, "any subsequent testing performed by law enforcement on the seized blood must be suppressed."

At the conclusion of the hearing on 3 February 2015, the court ruled orally on defendant's motions to suppress. The court then filed written orders on 23 March 2015.[1] The State timely appealed the trial court's order suppressing the blood test results.

The Court of Appeals affirmed the trial court's order suppressing the test results of the blood that Sergeant Fowler obtained from defendant at the hospital. *State v. Romano*, ___ N.C. App. ___, ___, 785 S.E.2d 168, 175 (2016). The court quoted *McNeely*'s holding that " 'the natural metabolization of alcohol in the bloodstream'

---

[1] At the suppression hearing, defendant made an oral motion to suppress the car keys and identification that were retrieved from him before he was transported to the hospital. The trial court denied suppression of the keys and identification; that order is not at issue in this appeal.

does not present a '*per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases.' " *Id.* at \_\_\_, 785 S.E.2d at 173 (quoting *McNeely*, 569 U.S. at \_\_\_, 133 S. Ct. at 1556). The Court of Appeals determined that N.C.G.S. § 20-16.2(b) could not justify a warrantless blood draw from an unconscious DWI defendant because *McNeely* "sharply prohibits *per se* warrant exceptions for blood draw searches." *Id.* at \_\_\_, 785 S.E.2d at 174.

Applying N.C.G.S. § 20-16.2(b) to the instant case, the Court of Appeals opined that "the record suggests, but does not affirmatively show, that [Sergeant] Fowler had 'reasonable grounds' to believe Defendant . . . was intoxicated while he drove his SUV," as opposed to his becoming intoxicated while drinking rum after leaving his vehicle. *Id.* at \_\_\_, 785 S.E.2d at 174. The court added: "More importantly, Fowler testified that she did not attempt to obtain a search warrant at any time, even though the magistrate's office was 'a couple of miles' away from the hospital." *Id.* at \_\_\_, 785 S.E.2d at 174. The court concluded that

> [t]he State's *post hoc* actions do not overcome the presumption that the warrantless search is unreasonable, and it offends the Fourth Amendment, the State Constitution, and *McNeely*. As the party seeking the warrant exception, the State did not carry its burden in proving "the exigencies of the situation made that [warrantless] course imperative." *Coolidge* [*v. New Hampshire*], 403 U.S. [443,] 455, 91 S.[ ]Ct. 2022[, 2032 (1971)]. Under the totality of the circumstances, considering the alleged exigencies of the situation, the warrantless blood draw was not objectively reasonable.

*See McNeely*, ___ U.S. at ___, 133 S.[ ]Ct. at 1558.

*Romano*, ___ N.C. App at ___, 785 S.E.2d at 174 (second alteration in original).

The Court of Appeals also concluded that neither the independent source doctrine nor the good faith exception to the warrant requirement applied in this case. *Id.* at ___, 785 S.E.2d at 174-75. The court first recognized that the State raised these arguments for the first time on appeal. Then, the court noted that under a previous Court of Appeals decision, "[t]he independent source doctrine permits the introduction of evidence initially discovered [during], or as a consequence of, an unlawful search, but later obtained independently from lawful activities untainted by the initial illegality." *Id.* at ___, 785 S.E.2d at 174 (quoting *State v. Robinson*, 148 N.C. App. 422, 429, 560 S.E.2d 154, 159 (2002)). The court determined that "[t]he sequence of events in this case does not follow this framework," in that the attending nurse knew that defendant was going to be arrested for DWI and that officers wanted his blood drawn. *Id.* at ___, 785 S.E.2d at 174. As such, the court concluded that "the nurse cannot be an independent lawful source." *Id.* at ___, 785 S.E.2d at 174. Additionally, the Court of Appeals concluded that "[t]he good faith exception," which "allows police officers to objectively and reasonably rely on a magistrate's warrant that is later found to be invalid," *id.* at ___, 785 S.E.2d at 174 (citation omitted), was not applicable in this situation because "the officers never attempted to obtain a search warrant prior to the blood draw," *id.* at ___, 785 S.E.2d at 175. Thus, the

officers could not "objectively and reasonably rely on the good faith exception." *Id.* at ___, 785 S.E.2d at 175.

Both parties sought review of the Court of Appeals' decision. This Court allowed both petitions for discretionary review on 18 August 2016.

After the parties filed their petitions for discretionary review but before they filed their briefs with this Court, the Supreme Court of the United States decided *Birchfield v. North Dakota*, 579 U.S. ___, 136 S. Ct. 2160 (2016). After we granted review, in their briefs and oral arguments to this Court, both parties acknowledged that the *Birchfield* decision challenges the constitutionality of N.C.G.S. § 20-16.2(b). Both in its brief and oral argument before this Court, the State recognized that *Birchfield* suggests that N.C.G.S. § 20-16.2(b) is unconstitutional. The State noted the differences between *Birchfield* and this case, but during oral argument stated that it could not read *Birchfield* to suggest anything other than that subsection 20-16.2(b) was unconstitutional. Defendant argued that subsection 20-16.2(b) was unconstitutional as applied to him because it created a per se exception to the warrant requirement in violation of *McNeely* and now also *Birchfield*. Defendant asserted that under *McNeely* and *Birchfield* both exigency and valid consent must be determined by a totality of the circumstances. Defendant argued that N.C.G.S. § 20-16.2(b) could only be constitutional if it could be read as allowing a blood draw from unconscious persons so long as the officer also complied with the Fourth Amendment.

The State also argued that the Court of Appeals' analyses of probable cause, state action, the independent source doctrine, and the good faith exception were incorrect and asked this Court to reverse or modify the Court of Appeals' opinion on those issues. Defendant argued that the State was procedurally barred from raising a state action, good faith, or independent source claim because these claims were not presented to the trial court.

We now address the application of the Supreme Court's decisions in *Birchfield v. North Dakota* and *Missouri v. McNeely* to the situation at bar, specifically, the warrantless blood draw from defendant for purposes of determining blood alcohol content. We hold that, in light of *Birchfield* and *McNeely*, N.C.G.S. § 20-16.2(b) is unconstitutional as applied to defendant because it permitted a warrantless search that violates the Fourth Amendment.[2] We also hold that the State's state action, good faith, and independent source claims are not properly before us.

---

[2] We recognize that other courts have grappled with the application of *McNeely* and *Birchfield* to implied-consent statutes as applied to unconscious DWI suspects and have reached differing conclusions. *Compare People v. Hyde*, 2017 CO 24, ¶ 32, ___ P.3d ___, ___ (holding that blood draw from an unconscious suspect was constitutional because statutory implied consent satisfies the consent exception to the Fourth Amendment warrant requirement), *with State v. Havatone*, 241 Ariz. 506, ___, 389 P.3d 1251, 1253, 1255 (2017) (holding that the "unconscious clause" of the implied-consent statute was unconstitutional as applied to the defendant and further determining that the "unconscious clause" can be constitutionally applied only when exigent circumstances prevent law enforcement from obtaining a warrant). *See generally Bailey v. State*, 338 Ga. App. 428, 434 & n.42, 790 S.E.2d 98, 103 & n.42 (2016) ("[I]mplied consent of an unconscious suspect is insufficient to satisfy the Fourth Amendment.") (collecting cases).

Appellate courts review a trial court's denial of a motion to suppress to determine whether the trial court's findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether the findings of fact support the trial court's conclusions of law. *State v. Brooks*, 337 N.C. 132, 140-41, 446 S.E.2d 579, 585 (1994) (citations omitted). Conclusions of law "are fully reviewable on appeal." *Id.* at 141, 446 S.E.2d at 585 (quoting *State v. Mahaley*, 332 N.C. 583, 592-93, 423 S.E.2d 58, 64 (1992), *cert. denied*, 513 U.S. 1089, 115 S. Ct. 749 (1995)). Whether a statute is constitutional is a question of law that this Court reviews de novo. We review the decision of the Court of Appeals for any errors of law. *Id.* at 149, 446 S.E.2d at 590 (citations omitted).

The Fourth Amendment to the United States Constitution and Article I of the North Carolina Constitution protect the rights of people to be secure from unreasonable searches and seizures. U.S. Const. amend. IV; N.C. Const. art. I, § 20. Our courts have held that drawing blood from a person constitutes a search under both the Federal and North Carolina Constitutions. *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826 (1966); *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553 (1988). A warrantless search of a person is per se unreasonable unless it falls within a recognized exception to the warrant requirement. *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1558; *see also Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971).

In this case Sergeant Fowler took possession of defendant's blood from the treating nurse while defendant was unconscious without first obtaining a warrant in reliance on N.C.G.S. § 20-16.2(b).  Subsection 20-16.2(b) states:

>   (b) **Unconscious Person May Be Tested**. – If a law enforcement officer has reasonable grounds to believe that a person has committed an implied-consent offense, and the person is unconscious or otherwise in a condition that makes the person incapable of refusal, the law enforcement officer may direct the taking of a blood sample or may direct the administration of any other chemical analysis that may be effectively performed. In this instance the notification of rights set out in subsection (a) and the request required by subsection (c) are not necessary.

N.C.G.S. § 20-16.2(b) (2016).  Thus, we must determine whether this warrantless search violated the Fourth Amendment.  This Court has never before addressed the constitutionality of N.C.G.S. § 20-16.2(b).  This issue was raised, but not thoroughly discussed, in the Court of Appeals opinion in *State v. Hollingsworth*, 77 N.C. App. 36, 334 S.E.2d 463 (1985).  In that case the Court of Appeals considered the application of the warrantless search exception permitted by N.C.G.S. § 20-16.2(b) but ultimately relied on *Cupp v. Murphy*, 412 U.S. 291, 93 S. Ct. 2000 (1973), and *Schmerber*, 384 U.S. 757, 86 S. Ct. 1826, to affirm the constitutionality of the officer's search and seizure in that case.[3]

---

[3] In *State v. Garcia–Lorenzo* the Court of Appeals again mentioned N.C.G.S. § 20-16.2(b) without specifically addressing or discussing the constitutionality of the statute.  110 N.C. App. 319, 430 S.E.2d 290 (1993).  In that case the court relied on *Schmerber*, 384 U.S. 757, 86 S. Ct. 1826, and *State v. Howren*, 312 N.C. 454, 456, 323 S.E.2d 335, 337 (1984), in determining that the defendant's constitutional rights to due process and to be free from illegal search and seizure were not violated.  *Garcia–Lorenzo*, 110 N.C. App. at 330, 430

In *Hollingsworth* a blood sample was taken from the defendant while he was unconscious at the hospital. The State argued that the defendant "gave implied consent to the blood test by operation of the 'implied consent' statute," N.C.G.S. § 20-16.2. 77 N.C. App. at 40, 334 S.E.2d at 466 (internal citation omitted). The Court of Appeals observed that "[N.C.]G.S. § 20-16.2 operates to imply consent by an unconscious driver to a blood alcohol test." *Id.* at 41, 334 S.E.2d at 467. The Court of Appeals, however, did not analyze whether the blood draw from the unconscious defendant was constitutional based upon an implied-consent rationale. *Id.* at 41-42, 334 S.E.2d at 467. Instead, the court held that the officer's actions did not violate the Fourth Amendment because a blood draw is only slightly intrusive, and probable cause and exigent circumstances existed, which permitted the officers to draw the defendant's blood without a warrant.[4] *Id.* at 44-45, 334 S.E.2d at 468-69. As to the exigency of destructibility of the evidence, the Court of Appeals relied on *Schmerber* in determining that "the body's breakdown of alcohol in the blood creates the reasonable risk that the evidence of intoxication will quickly be destroyed." *Id.* at 44, 334 S.E.2d at 468 (citing *Schmerber*, 384 U.S. 757, 86 S. Ct. 1826).[5]

---

S.E.2d at 296. The court also concluded that the defendant's *statutory* rights under N.C.G.S. 20-16.2 were not violated. *Id.* at 330-32, 430 S.E.2d at 296-97.

[4] Though *Hollingsworth* has been credited with upholding N.C.G.S. § 20-16.2(b) as constitutional, in *Hollingsworth* the court did not rely on section 20-16.2(b) for its rationale, and the constitutional analysis of the blood draw in *Hollingsworth* would have been the same with or without the statute. 77 N.C. App. at 41-42, 334 S.E.2d at 467.

[5] The Court of Appeals in *Hollingsworth* premised its decision, as did many courts across the country, on *Schmerber's* holding that indicated that all DWI cases involve exigent

In *Schmerber v. California* the Supreme Court of the United States upheld a warrantless blood test of an individual arrested for driving under the influence of alcohol because the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.' " 384 U.S. at 770, 86 S. Ct. at 1835 (quoting *Preston v. United States*, 376 U.S. 364, 367, 84 S. Ct. 881, 883 (1964)). After the *Schmerber* decision, courts split over "whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency" that justifies a warrantless, nonconsensual blood test in drunk-driving investigations. *See McNeely*, 569 U.S. at ___, 133 S. Ct. at 1558 & n.2. The Supreme Court settled this issue in *Missouri v. McNeely*, holding that "the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant," *id.* at ___, 133 S. Ct. at 1568, and that "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances," *id.* at ___, 133 S. Ct. at 1563.[6] Subsection

---

circumstances based solely on the fact that alcohol begins to naturally dissipate in the blood stream after a person stops drinking. *See, e.g.*, *State v. Shriner*, 751 N.W.2d 538 (Minn. 2008) (holding that the natural dissipation of blood alcohol evidence is per se exigency), *cert. denied*, 555 U.S. 1137, 129 S. Ct. 1001 (2009); *State v. Bohling*, 173 Wis. 2d 529, 494 N.W.2d 399 (same), *cert. denied*, 510 U.S. 836, 114 S. Ct. 112 (1993); *see also State v. Woolery*, 116 Idaho 368, 775 P.2d 1210 (1989) (same*), overruled by State v. Wulff*, 157 Idaho 416, 337 P.3d 575 (2014). The Supreme Court of the United States corrected this interpretation of *Schmerber* in its analysis of *McNeely* as discussed below. *See McNeely*, 569 U.S. at ___, 133 S. Ct. at 1558-63.

[6] *McNeely* distinguishes blood-testing cases from other destruction-of-evidence cases

-13-

20-16.2(b), therefore, cannot be constitutionally upheld based on a per se exigency rationale. Here the trial court aptly noted that this case does not involve a situation of exigency.

Though exigency did not relieve Sergeant Fowler of the requirement to obtain a warrant for a blood draw, the State argued that N.C.G.S. § 20-16.2 authorized Sergeant Fowler's actions because a DWI is an implied-consent offense. "[A] search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045 (1973). Thus, the State argued that by driving on the road, defendant consented to having his blood drawn for a blood test and never withdrew this statutorily implied consent before the blood draw. We must therefore determine whether the warrantless seizure of defendant's blood pursuant to N.C.G.S. § 20-16.2(b) was constitutional as applied to defendant based on the rationale that the seizure satisfied the consent exception to the warrant requirement.

North Carolina's Uniform Driver's License Act states that "[a]ny person who drives a vehicle on a highway or public vehicular area thereby gives consent to a

---

in which a suspect "has control over easily disposable evidence," such as *Cupp v. Murphy*, 412 U.S. at 296, 93 S. Ct. at 2004, in which the defendant was trying to get rid of evidence under his fingernails. *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1561. Blood alcohol concentration, on the other hand, "naturally dissipates over time in a gradual and relatively predictable manner." *Id.* at ___, 133 S. Ct. at 1561.

chemical analysis if charged with an implied-consent offense."[7] N.C.G.S. § 20-16.2(a) (2016). Impaired driving is an implied-consent offense. *Id.* § 20-16.2(a1) (2016). When a law enforcement officer "has reasonable grounds to believe that the person charged has committed the implied-consent offense," the officer "may obtain a chemical analysis of the person." *Id.* § 20-16.2(a).

Before the administration of any chemical analysis, the person charged must be informed orally and in writing of the following:

> (1) You have been charged with an implied-consent offense. Under the implied-consent law, you can refuse any test, but your drivers license will be revoked for one year and could be revoked for a longer period of time under certain circumstances, and an officer can compel you to be tested under other laws.

---

[7] In *Seders v. Powell*, 298 N.C. 453, 259 S.E.2d 544 (1979), this Court discussed the purpose and rationale for this implied-consent statute.

> By accepting his license and operating a motor vehicle on our highways, plaintiff consented to submitting to a [chemical analysis] if arrested for driving under the influence. . . . We think the legislature wisely enacted the statute in question. Its purpose is to provide scientific evidence of intoxication not only for the purpose of convicting the guilty and removing them from the public highways for the safety of others, but also to protect the innocent by eliminating mistakes from objective observation such as a driver who has the odor of alcohol on his breath when in fact his consumption is little or those who appear to be intoxicated but actually suffer from some unrelated cause. Public policy behind such a statute is a sound one. It ensures civil cooperation in providing scientific evidence and avoids incidents of violence in testing by force. It gives an arrested person a reasonable time to make up his mind about the test and yet does not tie up officers involved for an unreasonable amount of time which would interfere with their regular duties.

*Id.* at 464-65, 259 S.E.2d at 551-52.

(2) [Repealed.]

(3) The test results, or the fact of your refusal, will be admissible in evidence at trial.

(4) Your driving privilege will be revoked immediately for at least 30 days if you refuse any test or the test result is 0.08 or more, 0.04 or more if you were driving a commercial vehicle, or 0.01 or more if you are under the age of 21.

(5) After you are released, you may seek your own test in addition to this test.

(6) You may call an attorney for advice and select a witness to view the testing procedures remaining after the witness arrives, but the testing may not be delayed for these purposes longer than 30 minutes from the time you are notified of these rights. You must take the test at the end of 30 minutes even if you have not contacted an attorney or your witness has not arrived.

*Id.* "If the person charged willfully refuses to submit to [the] chemical analysis, none may be given under the provisions of this section, but the refusal does not preclude testing under other applicable procedures." N.C.G.S. § 20-16.2(c) (2016). Under N.C.G.S. § 20-16.2(b), a DWI suspect who is unconscious, however, does not have to be given notification of his right to refuse any test or given the opportunity to willfully refuse the test. *Id.* § 20-16.2(b).

In 2016, after this case proceeded through the trial court and the Court of Appeals, and the parties had submitted their petitions for discretionary review to this Court, the Supreme Court of the United States decided *Birchfield v. North Dakota.*

In *Birchfield* the Supreme Court for the first time addressed the constitutionality of a blood draw under the rationale of statutory implied consent, as well as whether a blood draw can be justified as a search incident to arrest.

The specific issue in *Birchfield* was "whether motorists lawfully arrested for drunk driving may be convicted of a crime or otherwise penalized for refusing to take a warrantless test measuring the alcohol in their bloodstream." 579 U.S. at ___, 136 S. Ct. at 2172. The Supreme Court concluded that "the Fourth Amendment permits warrantless breath tests incident to arrest for drunk driving" but does not permit warrantless blood tests incident to arrest for drunk driving. *Id.* at ___, 136 S. Ct. at 2184. Additionally, the Supreme Court concluded "that motorists cannot be deemed to have consented to submit to a blood test [by virtue of an implied-consent statute] on pain of committing a criminal offense." *Id.* at ___, 136 S. Ct. at 2186.

In *Birchfield* the Supreme Court first considered whether the warrantless "search-incident-to-arrest" doctrine applied to breath and blood tests. Using the analysis in *Riley v. California*, 573 U.S. ___, ___, 134 S. Ct. 2473, 2484 (2014)—which assessed the degree to which the search intrudes on an individual's privacy versus the degree to which the search is needed to promote a legitimate governmental interest—the Court determined that a breath test is a permissible search incident to arrest but a blood test is not. *Birchfield*, 579 U.S. at ___, ___, 136 S. Ct. at 2176, 2184-85. The Court noted that, unlike breath tests, blood tests require an intrusive

piercing of the skin and give law enforcement a sample that can be preserved and from which more than a blood alcohol reading can be determined. *Id.* at ___, 136 S. Ct. at 2178.

After determining that a warrantless blood test could not be justified as a search incident to arrest, the Court turned to whether a blood test is permissible based on a driver's statutory implied consent to submit to it. The Court noted that its "prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply." *Id.* at ___, 136 S. Ct. at 2185. Nonetheless, "[t]here must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads," *id.* at ___, 136 S. Ct. at 2185, and the Court determined that imposing a criminal penalty for refusing to submit to a blood test exceeds such a limit, *id.* at ___, 136 S. Ct. at 2186.

Here N.C.G.S. § 20-16.2(b) does not impose a criminal penalty for refusal to submit to a warrantless blood test; rather, the statute allows police to take blood from an unconscious person suspected of driving while intoxicated on the basis that the person has given implied consent by choosing to drive on public roads. Thus, *Birchfield* does not answer the specific question before us, namely, whether treating N.C.G.S. § 20-16.2(b) as a per se consent exception to the warrant requirement is

constitutional under the Fourth Amendment.[8] Though we do not have definitive guidance from the Supreme Court, based on the Supreme Court's Fourth Amendment precedent regarding consent as well as the rationale and language the Court employed in *McNeely* and *Birchfield*, we conclude that the blood draw from defendant cannot be justified under N.C.G.S. § 20-16.2(b) as a per se categorical exception to the warrant requirement.

Treating subsection 20-16.2(b) as an irrevocable rule of implied consent does not comport with the consent exception to the warrant requirement because such treatment does not require an analysis of the voluntariness of consent based on the totality of the circumstances. "[W]hether a consent to a search was in fact 'voluntary' . . . is a question of fact to be determined from the totality of all the circumstances." *Schneckloth,* 412 U.S. at 227, 93 S. Ct. at 2047-48. Further, the State has the burden to prove that "consent was, in fact, freely and voluntarily given." *Id.* at 222, 93 S. Ct. at 2045 (quoting *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S. Ct. 1788, 1792 (1968)). Consent is not voluntary if it is "the product of duress or coercion, express or implied." *Id.* at 227, 93 S. Ct. at 2048. A court's decision regarding whether a

---

[8] As discussed above, there is no dispute that the constitutionality of N.C.G.S. § 20-16.2(b) cannot be upheld under a per se exigency rationale. In *McNeely* the Supreme Court concluded that the natural dissipation of alcohol in the blood stream does not always constitute an exigency justifying the warrantless taking of a blood sample. 569 U.S. at ___, 133 S. Ct. at 1556. Exigent circumstances must be determined by the totality of the circumstances on a case-by-case basis. *Id.* at ___, 133 S. Ct. at 1559.

suspect's consent was voluntary is based on "a careful scrutiny of all the surrounding circumstances" and does not "turn[ ] on the presence or absence of a single controlling criterion." *Id.* at 226, 93 S. Ct. at 2047. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness . . . ." *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801, 1803-04 (1991); *State v. Stone*, 362 N.C. 50, 53, 653 S.E.2d 414, 417 (2007).

Additionally, in *McNeely*, though the Supreme Court only specifically addressed the exigency exception to the warrant requirement, *McNeely*, 569 U.S. at ___ n.3, 133 S. Ct. at 1559 n.3, the Court spoke disapprovingly of per se categorical exceptions to the warrant requirement, *id.* at ___, 133 S. Ct. at 1564 ("While the desire for a bright-line rule is understandable, the Fourth Amendment will not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake. . . . [A] case-by-case approach is hardly unique within our Fourth Amendment jurisprudence."). Moreover, language in *Birchfield*, though not specifically on point, indicates that taking blood without a warrant is an unreasonable search and seizure under the Fourth Amendment unless an exception to the warrant requirement applies, such as exigent circumstances or valid consent.

> It is true that a blood test, unlike a breath test, may be administered to a person who is unconscious (perhaps as a result of a crash) or who is unable to do what is needed to take a breath test due to profound intoxication or injuries. But we have no reason to believe that such

situations are common in drunk-driving arrests, and when
they arise, the police may apply for a warrant if need be.

*Id.* at ___, 136 S. Ct. at 2184-85.[9]

Thus, while the specific issue analyzed in *Birchfield* does not directly address the constitutionality of N.C.G.S. § 20-16.2(b) as applied to defendant, the reasoning and analysis in *Birchfield* and *McNeely*, as well as other Fourth Amendment precedent, suggest that blood draws may only be performed after either obtaining a warrant, obtaining valid consent from the defendant, or under exigent circumstances with probable cause. Here, because Sergeant Fowler relied on N.C.G.S. § 20-16.2(b) to take a blood draw outside these circumstances, we conclude that N.C.G.S. § 20-16.2(b) was unconstitutionally applied to defendant.[10]

Here there is no dispute that the officer did not get a warrant and that there were no exigent circumstances. Regarding consent, the State's argument was based solely on N.C.G.S. § 20-16.2(b) as a per se exception to the warrant requirement. To be sure, the implied-consent statute, as well as a person's decision to drive on public roads, are factors to consider when analyzing whether a suspect has consented to a blood draw, but the statute alone does not create a per se exception to the warrant

---

[9] This statement was made during the Court's analysis of whether a warrantless blood draw could be justified as a search incident to arrest. We believe that that the sentiment is also applicable to our analysis of implied consent.

[10] Our analysis here is limited to N.C.G.S. § 20-16.2(b) and does not address any other provision of the implied-consent statute.

requirement.  The State did not present any other evidence of consent or argue that under the totality of the circumstances defendant consented to a blood draw. Therefore, the State did not carry its burden of proving voluntary consent.  As such, the trial court correctly suppressed the blood evidence and any subsequent testing of the blood that was obtained without a warrant.

We now turn to the State's remaining concerns regarding the Court of Appeals' opinion below.  To the extent that the Court of Appeals questioned whether Sergeant Fowler had "reasonable grounds" to believe that defendant had committed the implied-consent offense of DWI, we modify that portion of the opinion.  The Court of Appeals stated that "[t]he record does not affirmatively show Defendant was intoxicated while he drove his SUV," *Romano*, ___ N.C. App. at ___, 785 S.E.2d at 174; however, a finding of "reasonable grounds" does not require "affirmative proof." "Reasonable grounds" in this context is equivalent to "probable cause."  S*ee Moore v. Hodges*, 116 N.C. App. 727, 729-30, 449 S.E.2d 218, 220 (1994) (citations omitted); *Rock v. Hiatt*, 103 N.C. App. 578, 584, 406 S.E.2d 638, 642 (1991) (citations omitted). Probable cause for an arrest requires "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty"; it does not require that "the evidence . . . amount to proof of guilt, or even to prima facie evidence of guilt."  *State v. Harris*, 279 N.C. 307, 311, 182 S.E.2d 364, 367 (1971).

The record shows that defendant stopped his vehicle at a congested intersection in the middle of the day, left the vehicle while wearing his sweater backwards, and proceeded to stumble across four lanes of traffic. Defendant had a bottle of rum in his possession, and had vomited on himself and in his vehicle before exiting the SUV. When police arrived, defendant was incoherent with slurred speech; his eyes were bloodshot; he smelled strongly of alcohol; and he could not stand or sit without assistance. Thus, there was sufficient evidence in the record to show that Sergeant Fowler had reasonable grounds to believe defendant had committed a DWI offense. Furthermore, defendant has never contested this issue on appeal and has conceded that there were reasonable grounds to believe he committed a DWI offense.

The State also argues that there was no state action and that the good faith exception and the inevitable discovery and independent source exceptions to the exclusionary rule are applicable in this case. A review of the record reveals that the State did not advance these arguments at the suppression hearing; accordingly, the issues are waived and are not properly before this Court. N.C. R. App. P. 10; *see State v. Cooke*, 306 N.C. 132, 136-38, 291 S.E.2d 618, 621-22 (1982) (stating that a party is limited to specific grounds argued to the trial court and concluding in particular that the State cannot assert new bases to justify admissibility of evidence obtained from a warrantless search for the first time on appeal).

Here defendant argued at the suppression hearing that the statute's per se exception to the warrant requirement was unconstitutional under *McNeely*, and the trial court specifically asked the parties for additional research regarding "the constitutionality of the statute . . . in regard to the unconscious defendant." The State was aware that the statute's constitutionality was questionable and that Sergeant Fowler's actions may have been illegal. The State had the opportunity at the suppression hearing to argue that the good faith exception to the exclusionary rule should apply if the court determined that the officer's actions were unconstitutional, but the State failed to raise the argument. N.C. R. App. P. 10; s*ee, e.g.*, *State v. Rodrigues,* 67 Haw. 496, 498, 692 P.2d 1156, 1158 (1985) (per curiam) (holding that the State, when seeking reversal of a trial court's grant of a motion to suppress, waived the argument that a good faith exception to the exclusionary rule applied because "the State had never presented the issue . . . to the trial court" and observing that "[i]t is a generally accepted rule that issues not raised at the trial level will not be considered on appeal" (citations omitted)).

Additionally, the trial court explicitly invited the parties to make an argument regarding whether the nurse was a third-party actor; the State made no argument that the nurse was not a state actor, or that the seizure of the blood was not an act of the State and thus, was not subject to the Fourth Amendment's search and seizure analysis. *See Cooke*, 306 N.C. 132, 136, 291 S.E.2d 618, 621 (1982) (concluding that the State could not advance the argument on appeal that "the Fourth Amendment

does not apply" when it "failed to [present this argument] at the suppression hearing in the trial court"); *see also United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013) (noting that the government bears the burden to prove, as an initial matter, that a challenged search or seizure is not unlawful (citing, *inter alia*, *Welsh v. Wisconsin,* 466 U.S. 740, 749-50, 104 S. Ct. 2091, 2097 (1984)), *cert denied*, ___ U.S. ___, 134 S. Ct. 1572 (2014).

Though we do not address the merits of the State's arguments regarding these exceptions to the exclusionary rule, we will address the State's concerns regarding the Court of Appeals' statements of law pertaining to these issues. The Court of Appeals' opinion seems to limit the federal good faith exception's[11] applicability to situations in which law enforcement reasonably relies on a magistrate's warrant that is later found to be invalid; however, this is not the only situation in which the good faith exception to the exclusionary rule may apply. For example, the good faith exception also applies to searches conducted in reasonable reliance on subsequently invalidated statutes, as well as searches conforming to appellate precedent. *See Davis v. United States*, 564 U.S. 229, 237-41, 131 S. Ct. 2419, 2428-29 (2011); *Illinois v. Krull*, 480 U.S. 340, 349-60, 107 S. Ct. 1160, 1166-72 (1987). Additionally, to the extent that the Court of Appeals conflated the state action analysis with the

---

[11] We specify that this is the federal good faith exception to the exclusionary rule because in *State v. Carter* this Court declined to adopt a good faith exception to the state constitution's exclusionary rule. 332 N.C. 709, 724, 370 S.E.2d 553, 562 (1988).

independent source and inevitable discovery analysis in concluding that "the nurse cannot be an independent lawful source," we clarify that whether a third party is acting as an agent of the State and whether the independent source exception to the exclusionary rule applies are separate determinations.

In sum, we hold that N.C.G.S. § 20-16.2(b) is unconstitutional under the Fourth Amendment as applied to defendant in this case. We also hold that the State's state action, good faith, and independent source claims are not properly before us.

For the foregoing reasons we affirm as modified herein the Court of Appeals' opinion affirming the trial court's order suppressing any testing of defendant's blood. We remand this case to the Court of Appeals for further remand to the trial court for additional proceedings not inconsistent with this opinion.

MODIFIED AND AFFIRMED; REMANDED.

Chief Justice MARTIN dissenting.

Subsection 20-16.2(b) of our General Statutes authorizes the police to direct the drawing of blood from an unconscious defendant who is suspected of impaired driving in order to determine the defendant's blood-alcohol content, based on the defendant's implied consent to a blood test. *See generally* N.C.G.S. § 20-16.2(a)-(b) (2015). In this case, Sergeant Ann Fowler, a supervising sergeant in the Asheville-

Buncombe DWI task force, relied in good faith on this statutory provision when she accepted a portion of defendant's blood that the attending nurse drew on the day of defendant's arrest for impaired driving. At that time, the provision had never been held unconstitutional. It may now be unconstitutional, at least as applied to defendant, but only because of a decision that the Supreme Court of the United States issued after the State had filed a petition for review of this case in this Court. The search that was conducted in this case therefore falls into the good faith exception to the exclusionary rule under federal law. Because of that, and because—contrary to what the majority says—the State preserved its good faith exception argument for appeal, I respectfully dissent.

First, let me address the preservation issue. To understand why the majority is wrong to say that the State failed to preserve its good faith exception argument, it helps to look at what happened when.

In 1993, more than two decades before this case arose, our Court of Appeals upheld subsection 20-16.2(b) against a Fourth Amendment challenge. In *State v. Garcia–Lorenzo*, the Court of Appeals ruled that the defendant in that case, who—like defendant here—was sedated for medical reasons and then subjected to a blood draw while unconscious, "had no constitutional right to refuse to submit to chemical analysis." 110 N.C. App. 319, 327-30, 430 S.E.2d 290, 294-96 (1993). Citing an opinion of this Court, the Court of Appeals indicated that the General Assembly had simply "given the right to refuse to submit to chemical analysis as a matter of grace."

*Id.* at 330, 430 S.E.2d at 296 (citing *State v. Howren*, 312 N.C. 454, 456, 323 S.E.2d 335, 337 (1984)). The Court of Appeals also analyzed whether the defendant's statutory rights had been violated and found that they had not been. *Id.* at 330-32, 430 S.E.2d at 296-97. It then held that the evidence derived from the blood draw was admissible. *See id.* at 327, 332, 430 S.E.2d at 294, 297.[12]

Twenty years later, in 2013, the Supreme Court of the United States decided *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552 (2013). *McNeely* held that, in drunk-driving investigations, the dissipation of alcohol in the bloodstream through natural metabolic processes does not create a per se exigency that would permit a warrantless blood draw in every case. *Id.* at ___, 133 S. Ct. at 1556. Instead, the government has to show, on a case-by-case basis, that exigent circumstances other than the mere dissipation of alcohol are present. *See id.* at ___, ___, 133 S. Ct. at 1556, 1568.

---

[12] The majority downplays *Garcia–Lorenzo*'s significance by claiming that *Garcia–Lorenzo* did not "specifically address[ ] or discuss[ ] the constitutionality of" subsection 20-16.2(b). That is true in a strictly formal sense, but not in any practical sense. In *Garcia–Lorenzo*, the Court of Appeals discussed whether the admission of evidence obtained under the subsection was constitutional, but not whether the subsection *itself* was constitutional. *See id.* at 330, 430 S.E.2d at 296. As I have just noted, however, the Court of Appeals ruled that an unconscious defendant did not have a constitutional right to refuse a blood draw. *See id.* at 328-30, 430 S.E.2d at 295-96. It necessarily followed that, in the Court of Appeals' view, subsection 20-16.2(b) was constitutional.

In 2014, the search and arrest pertinent to this case took place. Defendant was detained for impaired driving, taken to a hospital for medical treatment, and subjected to a warrantless blood draw while unconscious.

In January 2015, defendant filed his motion to suppress. At the suppression hearing, which took place the next month, Sergeant Fowler testified that she relied on subsection 20-16.2(b) when she took custody of defendant's blood, and the State argued that subsection 20-16.2(b) was constitutional. Defendant responded that, under *McNeely*, subsection 20-16.2(b) was unconstitutional because it created a per se exigent circumstances exception to the warrant requirement. The trial court agreed with defendant, found that no other exigency to justify a warrantless search was present in this case, and excluded the blood test results.

The State appealed. In its brief to the Court of Appeals, the State again argued that subsection 20-16.2(b) was constitutional. It also argued in its brief to the Court of Appeals that, even if that subsection were unconstitutional, the good faith exception to the exclusionary rule would make the evidence in question admissible. In April 2016, the Court of Appeals affirmed the trial court's decision. *See State v. Romano*, ___ N.C. App. ___, ___, 785 S.E.2d 168, 175 (2016). The State filed a petition for discretionary review with this Court.

In June 2016, while the State's petition was pending in this Court, the Supreme Court of the United States decided *Birchfield v. North Dakota*, 579 U.S. ___,

136 S. Ct. 2160 (2016). *Birchfield* addressed whether implied-consent laws that make it a crime for a lawfully arrested drunk-driving suspect to refuse to take a breath test or a blood test comply with the Fourth Amendment. *Id.* at ___, ___, 136 S. Ct. at 2166-67, 2184. Early in the *Birchfield* opinion, the Court suggested that this analysis hinged on whether a warrantless search of breath or blood is constitutional and said that, if it is, then refusing to submit to the search can be criminalized. *See id.* at ___, 136 S. Ct. at 2172-73. Later on in the opinion, the Court found that warrantless breath tests can be criminalized because they are searches incident to arrest, but that warrantless blood tests cannot be criminalized under either a search-incident-to-arrest theory or an implied-consent theory. *Id.* at ___, 136 S. Ct. at 2184-86. Read together, these two parts of *Birchfield* may indicate that it is unconstitutional to conduct a warrantless blood draw of a suspected drunk driver based only on the driver's statutorily inferred consent. If so, then it would be unconstitutional to conduct a warrantless blood draw based only on implied consent even when the suspected drunk driver is unconscious.

After *Birchfield* was handed down, this Court allowed the State's petition for discretionary review. In its briefing before this Court, the State all but concedes that subsection 20-16.2(b) is unconstitutional under *Birchfield* but also argues that it preserved its good faith argument for appeal, and it continues to argue that the good faith exception applies here.

It is beyond dispute that the State briefed the exclusionary rule's good faith exception before the Court of Appeals and again before this Court. So the majority's ruling that the State's good faith argument has not been preserved rises or falls on whether the State adequately raised that argument before the trial court. The State's *only* justification for accepting the blood drawn by the nurse that Sergeant Fowler testified about at the suppression hearing, and that the State argued to the trial court at that hearing, was that Sergeant Fowler had relied on N.C.G.S. § 20-16.2(b). Because the State clearly argued that Sergeant Fowler relied on this statutory provision, the majority can maintain that the State failed to preserve its good faith argument only if, in the majority's view, the State had to couch its statutory-reliance argument in the language of the good faith exception. In other words, the majority must think that it was wrong for the State to do what the State in fact did: argue before the trial court that Sergeant Fowler reasonably relied on the statute and that the statute was constitutional.[13]

But why should the State have to do otherwise? As we have seen, when the State opposed defendant's motion to suppress before the trial court, binding precedent from our own Court of Appeals seemed to make it clear that subsection 20-

---

[13] The majority also cites *State v. Rodrigues*, a 1985 case from Hawaii, to support its argument. *See* 67 Haw. 496, 498, 692 P.2d 1156, 1158 (1985) (per curiam). But in *Rodrigues*, the State of Hawaii relied only on actual consent when arguing before the trial court that the evidence in question there was admissible. *See id.* at 497-98, 692 P.2d at 1157-58. Hawaii did not "even hint[ ]" at the trial court level "that [it] was also relying . . . on a 'good faith' exception theory." *Id.* at 498, 692 P.2d at 1158.

16.2(b) withstood Fourth Amendment scrutiny. Did the State really have to make an alternative argument, in the face of then-binding caselaw that supported its main argument, that assumed the statute's invalidity and that used the magic words "good faith exception"?

Remember, it was not until *Birchfield* was decided—and thus not until this case had already been appealed to this Court—that the Supreme Court called subsection 20-16.2(b) into constitutional doubt. When this case was still before the trial court, therefore, the State had every reason to think that Sergeant Fowler had relied on a *constitutionally permitted* statute that justified the search of defendant.

The majority suggests that *McNeely* changed the equation. Granted, *McNeely* had already been handed down when the trial court held the suppression hearing here. *McNeely*'s holding, however, was about exigency—specifically, whether exigency always exists when the police suspect a person of driving drunk because alcohol in the bloodstream naturally dissipates over time. *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1556. Exigency, of course, is an exception to the warrant requirement, *see, e.g.*, *id.* at ___, 133 S. Ct. at 1558, meaning that an officer does not need a warrant to conduct a search when exigent circumstances exist, *see, e.g.*, *Kentucky v. King*, 563 U.S. 452, 460 (2011). But an officer who has *consent* to conduct a search does not need a warrant either. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In other words, consent and exigency are two separate exceptions to the warrant

requirement. It follows that an officer with consent to conduct a search does not need exigent circumstances to justify it.

This case has always been about consent. As the majority admits, "Sergeant Fowler did not . . . believe any exigency existed. Instead, she expressly relied upon the statutory authorization set forth in [subsection] 20-16.2(b) . . . ." (Brackets in original; internal quotation marks omitted.) And subsection 20-16.2(b) allows an officer to direct the drawing of blood from an unconscious suspect based on the suspect's implied consent. *See* N.C.G.S. § 20-16.2(a)-(b). *McNeely*'s holding thus has no bearing on this case, which hinges on defendant's consent or lack thereof, not on exigent circumstances.

So, given the state of the law as it existed at the time of the suppression hearing, the State had absolutely no reason to weaken its case by conceding that the statute on which Sergeant Fowler relied might be unconstitutional. Controlling caselaw from our Court of Appeals settled the issue—at least for the purposes of any proceedings before the trial court—and no higher court had done anything to undermine that caselaw. In that situation, the State should be allowed to oppose a suppression motion by depending exclusively on the argument that a statute relied on for a Fourth Amendment search is in fact constitutional. By refusing to give the State this tactical option—even when the State has based its whole argument on an officer's good faith reliance on a facially valid statute—the majority has effectively penalized the State for having a strong case.

To support its anti-preservation argument, the majority cites Rule 10 of the North Carolina Rules of Appellate Procedure. But, far from supporting the majority's argument, that rule only bolsters my point. It states that, "[i]n order to preserve an issue for appellate review, a party must . . . stat[e] the specific grounds for the ruling the party desired the court to make *if the specific grounds were not apparent from the context.*" N.C. R. App. P. 10(a)(1) (emphasis added). This rule squarely applies here. When the State is exclusively arguing before the trial court that an officer relied on a statute to conduct a search, how could the State *not* want the trial court to rule that the officer relied on the statute *in good faith*? As I will discuss below, as long as the statute in question is not clearly unconstitutional, that is all that is required for the good faith exception to apply. So Rule 10 shows that, in this particular context, the State does not even need to expressly make a good faith exception argument in order to preserve that argument. A trial court should recognize that if the State loses on the Fourth Amendment merits, the State will still want the trial court to rule in its favor based on the good faith exception.

For all of these reasons, I would hold that the State has preserved its good faith exception argument for appeal. I now turn to the substantive constitutional question, which is governed exclusively by federal law.[14]

---

[14] Defendant's written motion to suppress does not refer to the state constitution, and his arguments at the suppression hearing were based solely on the Fourth Amendment.

In *United States v. Leon*, the Supreme Court of the United States held that evidence obtained through a Fourth Amendment violation should not be excluded if, when conducting the search that led to the evidence, the police rely in good faith on a search warrant issued by a neutral and detached magistrate, even if the warrant is later found to lack probable cause. *See* 468 U.S. 897, 900, 925-26 (1984). The Court explained that the good faith standard is one of objective, not subjective, reasonableness. *Id.* at 919 n.20. *Illinois v. Krull* then held, based on the principles announced in *Leon*, that the good faith exception to the exclusionary rule also applies when the police rely in good faith on a *statute* authorizing warrantless searches that is later found to be unconstitutional. *See* 480 U.S. 340, 342, 349-55 (1987).

Although *Krull* pertained specifically to an administrative search, *id.* at 342, the rationale for the good faith exception that both *Leon* and *Krull* provide plainly extends to other kinds of searches as well. The Court in *Leon* noted that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916. And in *Krull*, the Court said that "[t]he approach used in *Leon* is equally applicable to the present case" because "suppress[ing] evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect" as suppressing evidence obtained "in objectively reasonable reliance on a warrant." *Krull*, 480 U.S. at 349. Paraphrasing *Leon*, the Court in *Krull* commented that "[p]enalizing the officer for the [legislature's] error, rather than his own, cannot logically contribute to

the deterrence of Fourth Amendment violations." *Id.* at 350 (second brackets in original) (quoting *Leon*, 468 U.S. at 921).

Other cases that the Supreme Court has handed down since *Leon* reinforce the good faith exception's broad applicability. In *Arizona v. Evans*, for instance, the Court addressed whether the good faith exception applies when a police officer reasonably relies on a police record that indicates the existence of an outstanding arrest warrant but that is later shown to be erroneous. 514 U.S. 1, 3-4 (1995). Noting that an employee of a Clerk of Court's office was the source of the error in that case, the Court held that the good faith exception applied. *Id.* at 4, 14-16. More recently, the Court held that the good faith exception applies "when the police conduct a search in compliance with binding precedent that is later overruled." *Davis v. United States*, 564 U.S. 229, 232 (2011). The reason that all of these cases are decided as they are boils down to the same core principle: that the exclusionary rule is designed to deter *police* misconduct, not misconduct or mistakes by other government actors. *See id.*; *Evans*, 514 U.S. at 14; *Krull*, 480 U.S. at 349-50; *Leon*, 468 U.S. at 916.

In this case, although Sergeant Fowler did not exactly "direct the taking of a blood sample," as subsection 20-16.2(b) contemplates, she still relied on that subsection when she took custody of excess blood from a vial that the attending nurse had drawn for medical purposes. After all, if subsection 20-16.2(b) permits a blood draw from an unconscious defendant, it must also permit the lesser intrusion entailed

by taking custody of blood that has already been drawn for other purposes, which is what Sergeant Fowler did here.

Sergeant Fowler's reliance on subsection 20-16.2(b) was objectively reasonable, too. "Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law." *Krull*, 480 U.S. at 349-50. To reiterate, not only was subsection 20-16.2(b) not clearly *unconstitutional* when defendant's blood was drawn; it had already been held *constitutional* by our Court of Appeals.

The good faith exception to the exclusionary rule applies in instances where "suppression would do nothing to deter police misconduct . . . and . . . would come at a high cost to both the truth and the public safety." *Davis*, 564 U.S. at 232. Because Sergeant Fowler relied in good faith on N.C.G.S. § 20-16.2(b) when she took custody of blood drawn by the attending nurse, and because the State preserved its argument to this effect, I would hold that the good faith exception applies here. I would therefore reverse the decision of the Court of Appeals and remand for a trial in which the blood test results that defendant seeks to suppress are deemed admissible under the Fourth Amendment. As a result, I respectfully dissent.

Justices NEWBY and JACKSON join in this dissenting opinion.

Justice NEWBY dissenting.

I fully agree with and join the dissenting opinion, which correctly applies our waiver precedent and thoughtfully discusses the good faith exception. I am also of the view, however, that, on the record before us, the medical staff who drew defendant's blood were not state actors. State action is a threshold consideration in any Fourth Amendment analysis. Because the constitutional protections against unreasonable searches and seizures apply only to actions by governmental officials and their agents, and defendant failed to establish that the medical personnel were such agents, the blood draw at issue was not a search contemplated by the Fourth Amendment.

Defendant received treatment for severe intoxication at a private hospital. Upon arrival there, defendant was belligerent and combative toward the medical staff and the officers present. Irrespective of any criminal investigation, "medical staff determined it was necessary to medicate" defendant and draw his blood, though they knew law enforcement might require a blood sample for their DWI investigation. Officers were not present when medical staff drew defendant's blood. Importantly, nothing in the record suggests the officers coerced, enticed, induced, or otherwise instructed medical staff to draw defendant's blood or to draw more than was medically necessary.

*Newby, J., dissenting*

The Fourth Amendment declares, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; *see also State v. Garner,* 331 N.C. 491, 506-07, 417 S.E.2d 502, 510-11 (1992) (adopting the inevitable discovery exception to the exclusionary rule and noting that our state constitution's limitation against unreasonable searches and seizures does not confer protections beyond those afforded by the Fourth Amendment). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S. Ct. 1652, 1656, 80 L. Ed. 2d 85, 94 (1984) (footnotes omitted).

Though a blood draw can constitute a search under the Fourth Amendment, *e.g., Missouri v. McNeely,* ___ U.S. ___, ___, 133 S. Ct. 1552, 1558, 185 L. Ed. 2d 696, 704 (2013), the Fourth Amendment protects against unreasonable searches or seizures by state actors exclusively, *e.g., Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S. Ct. 574, 576, 65 L. Ed. 1048, 1051 (1921) (concluding that the Fourth Amendment proscribes only unreasonable governmental action); *see also State Action, Black's Law Dictionary* (10th ed. 2014) ("Anything done by a government; . . . an intrusion on a person's rights . . . by a governmental entity . . . ."). The Fourth Amendment generally does not apply to a search or seizure, even an unreasonable one, by a private person. *See Burdeau,* 256 U.S. at 475, 41 S. Ct. at 576, 65 L. Ed. at 1051. Thus, evidence

obtained from an unreasonable private search need not be excluded from a criminal trial. *See Walter v. United States,* 447 U.S. 649, 656, 100 S. Ct. 2395, 2401, 65 L. Ed. 2d 410, 417 (1980) (plurality opinion) ("[A] wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and . . . does not deprive the government of the right to use evidence that it has acquired lawfully." (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 487-90, 91 S. Ct. 2022, 2048-50, 29 L. Ed. 2d 564, 595-96 (1971))).

In certain cases, however, the Fourth Amendment may limit private conduct when private persons become state actors, thereby acting as " 'instrument[s]' or agent[s] of the state." *Coolidge,* 403 U.S. at 487, 91 S. Ct. at 2048-49, 29 L. Ed. 2d at 595 (citations omitted). Whether a private party becomes a state actor "turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved 'in light of all the circumstances.' " *Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 614-15, 109 S. Ct. 1402, 1411-12, 103 L. Ed. 2d 639, 658 (1989) (internal citations omitted) (quoting *Coolidge,* 403 U.S. at 487, 91 S. Ct. at 2049, 29 L. Ed. 2d at 595). Relevant factors include "the degree of governmental involvement, such as advice, encouragement, knowledge about the nature of the citizen's activities, and the legality of the conduct encouraged by the police." *State v. Sanders,* 327 N.C. 319, 334, 395 S.E.2d 412, 422 (1990), *cert. denied*, 498 U.S. 1051, 111 S. Ct. 763, 112 L. Ed. 2d 782 (1991). The defendant, not the State, bears the burden of establishing state action, thus triggering the protections of the Fourth

Amendment. *See State v. Taylor,* 298 N.C. 405, 415, 259 S.E.2d 502, 508 (1979) ("[I]t is well settled that the burden is on defendant to establish [Fourth Amendment] standing." (citing, *inter alia, Jones v. United States,* 362 U.S. 257, 261, 80 S. Ct. 725, 731, 4 L. Ed. 2d 697, 702 (1960), *overruled on other grounds by United States v. Salvucci,* 448 U.S. 83, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980))); *see, e.g., Sanders,* 327 N.C. at 334, 395 S.E.2d at 422 (admitting the evidence because the defendant "failed to show that [a private citizen's] seizure specifically of the topaz ring and white gold watch was" "attributable to the State").

Though the State is on solid legal ground in making its statutory argument, our precedent "requires that we first determine whether, under the facts of this case, there has been a search." *State v. Reams,* 277 N.C. 391, 396, 178 S.E.2d 65, 68 (1970), *cert. denied,* 404 U.S. 840, 92 S. Ct. 133, 30 L. Ed. 2d 74 (1971), *overruled on other grounds by State v. Worsley,* 336 N.C. 268, 443 S.E.2d 68 (1994); *see State v. Raynor,* 27 N.C. App. 538, 540, 219 S.E.2d 657, 659 (1975) ("Before the legality of an alleged search may be questioned, it is necessary to first determine whether there has actually been a search."); *see also Reams*, 277 N.C. at 396, 178 S.E.2d at 68 ("[W]hen the evidence is delivered to a police officer upon request and without compulsion or coercion, there is no search within the constitutional prohibition against unreasonable searches and seizures."). Because the Fourth Amendment's prohibition on unreasonable searches operates only against the government and its agents,

*Burdeau,* 256 U.S. at 475, 41 S. Ct. at 576, 65 L. Ed. at 1051, the nature of the actor remains a threshold question.

Here the record before us does not support the existence of an agency relationship between the medical staff of a private hospital and law enforcement. Nothing in the record suggests the government had anything to do with the blood draw, and defendant fails to persuasively argue that the blood draw was the result of state action. To the contrary, the record reflects that law enforcement never asked the medical staff to draw defendant's blood and were not in the room during the blood draw. Nothing suggests that law enforcement prompted, enticed, or induced the medical staff to draw more blood than medically necessary. Instead, medical staff drew defendant's blood for purposes of his medical treatment, irrespective of any criminal investigation. Whether medical staff knew that law enforcement would eventually need a sample of defendant's blood is irrelevant. *See State v. Kornegay,* 313 N.C. 1, 10-12, 326 S.E.2d 881, 890-91 (1985) (concluding that a private citizen who copied a defendant's records to turn over to the State Bureau of Investigation in exchange for prosecutorial immunity was not a state agent). When the nurse, "of her own accord," produced the blood sample, "it was not incumbent on the police to stop her or avert their eyes." *Coolidge,* 403 U.S. at 489, 91 S. Ct. at 2049, 29 L. Ed. 2d at 596. Accordingly, there was nothing wrongful about the State's "acquisition of the [vial of blood] or its examination of [its] contents to the extent that [the blood] had

already been examined by third parties." *Walter,* 447 U.S. at 656, 100 S. Ct. at 2401, 65 L. Ed. 2d. at 417.

The majority's puzzling attempt to avoid this issue concludes, in a few lines of dismissive prose, that the State waived any state action argument. The purpose of the waiver rule is to "prevent . . . errors . . . that [a] court could have corrected if brought to its attention at the proper time." *Wall v. Stout,* 310 N.C. 184, 188-89, 311 S.E.2d 571, 574 (1984). Here it is beyond dispute that the State briefed the issue of state action before the Court of Appeals and again before this Court. [15] Moreover, the trial court recognized that "[t]he issue with regard to the blood . . . [being] drawn by a third party" was before the court and concluded that "the blood draw . . . [was] a part of the normal course of treatment and would have occurred without any subsequent police action." It is our duty as a jurisprudential court to address state action as the threshold legal question in any Fourth Amendment analysis.

Even assuming that a Fourth Amendment search occurred, defendant fails to persuasively argue that he retained any ongoing expectation of privacy in the vial of

---

[15] Before the Court of Appeals, the State argued, *inter alia,* that the blood draw was for medical purposes and was not "government action." Before this Court, the State argued, *inter alia*, that the blood draw was conducted by a third party actor, not an agent of the police.

The State has also advanced an argument based upon the independent source exception to the exclusionary rule. This exception is distinct from the state action requirement and permits the introduction of evidence initially discovered from an unlawful search "but later obtained independently from activities untainted by the initial illegality." *Murray v. United States*, 487 U.S. 533, 537, 108 S. Ct. 2529, 2533, 101 L. Ed. 2d 472, 480 (1988). Regardless, the independent source doctrine presupposes that the invasion of privacy involved a state actor and that a search occurred.

blood. *See State v. Barkley,* 144 N.C. App. 514, 518-19, 551 S.E.2d 131, 134-35, *appeal dismissed,* 354 N.C. 221, 554 S.E.2d 646 (2001). The sample here was lawfully removed from his body, and the State's analysis of the blood sample did not involve any further search and seizure of defendant's person. *See id.* at 518-20, 551 S.E.2d at 134-35; *see also Washington v. State,* 653 So. 2d 362, 364 (Fla. 1994) (per curiam) (concluding that once the samples were validly obtained in one case, the State was not prohibited from using them in another case), *cert. denied,* 516 U.S. 946, 116 S. Ct. 387, 133 L. Ed. 2d 309 (1995); *Bickley v. State,* 227 Ga. App. 413, 415, 489 S.E.2d 167, 170 (1997) (finding no constitutional violation when the defendant's blood was drawn pursuant to a warrant and used in an unrelated case, noting that, "[i]n this respect, DNA results are like fingerprints which are maintained on file by law enforcement authorities for use in further investigations" (brackets in original)); *Smith v. State,* 744 N.E.2d 437, 439 (Ind. 2001) (stating that once a DNA profile is obtained, the owner no longer has any possessory or ownership interest in it); *Wilson v. State,* 132 Md. App. 510, 550, 752 A.2d 1250, 1272 (2000) (concluding that the lawful use of the defendant's DNA in an unrelated case did not violate his Fourth Amendment rights because the defendant lost "[a]ny legitimate expectation of privacy that [he] had in his blood . . . when that blood was validly seized").

To be sure, "an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.'" *McNeely,* ___ U.S. at ___, 133 S. Ct. at 1558, 185 L. Ed. 2d at 704 (quoting *Winston v. Lee,* 470 U.S. 753, 760, 105 S.

Ct. 1611, 1616, 84 L. Ed. 2d 662, 668 (1985)). Such an expectation should be jealously guarded from unreasonable government intrusion. Nevertheless, the Fourth Amendment proscribes only unreasonable governmental action and does not apply to a search or seizure, even an unreasonable one, effectuated by a private party not acting as a governmental agent.

In sum, the threshold question in any Fourth Amendment analysis is whether a person's reasonable expectation of privacy was invaded by a governmental official or agent. The majority's analysis erroneously overlooks this foundational principle. Because the constitutional protections against unreasonable searches and seizures apply only to actions by governmental officials and their agents, and defendant failed to establish that the medical staff were such agents, the blood draw at issue was not a search contemplated by the Fourth Amendment.